

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-18-00171-CV

---

REX PERFORMANCE PRODUCTS, LLC, Appellant

V.

MANU BETTEGOWDA AND PREGIS PERFORMANCE PRODUCTS, LLC,
Appellees

---

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-298129-18

---

Before Gabriel and Kerr, JJ., and Gonzalez, J.[1]
Memorandum Opinion by Visiting Judge Ruben Gonzalez, Sitting by Assignment

---

[1]The Honorable Ruben Gonzalez, Judge of the 432nd District Court of Tarrant County, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to section 74.003(h) of the government code. *See* Tex. Gov't Code Ann. § 74.003(h).

## MEMORANDUM OPINION

### I.  Introduction

In two issues in this accelerated interlocutory appeal,[2] Appellant Rex Performance Products, LLC, a Michigan limited liability company, appeals the trial court's order granting the special appearance filed by Appellees Pregis Performance Products, LLC, a Delaware limited liability company, and Manu Bettegowda, a Connecticut resident and Pregis's agent, asking us to find that Bettegowda's email communications with a Texas resident provided sufficient minimum contacts to establish personal jurisdiction.  We affirm.

### II.  Background

Rex sued James Donald Tate, Olympus Partners, LP,[3] and Appellees, alleging that Tate, a Texas resident and Rex's president, CEO, and minority share owner, had secretly negotiated a side deal for himself when he negotiated the February 23, 2018 sale of Rex's assets to Pregis.  The "side deal," which Rex claimed was discovered by reviewing Tate's emails before the sale closed, involved a $1.5 million "Super Bonus"

[2]*See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (providing for interlocutory appeal of the grant or denial of a defendant's special appearance under rule of civil procedure 120a); Tex. R. App. P. 28.1(a).

[3]At the special appearance hearing, Appellees' lawyer informed the court that Olympus Partners, LP did not exist and that the special appearance was filed on behalf of Olympus Growth Fund V, L.P., the entity that they thought Rex had intended to sue.  Bettegowda is a partner in Olympus Growth Fund V, L.P.  The trial court lined out "Olympus Growth Fund V, L.P." in the order granting the special appearance, and no Olympus entity is a party to this appeal.

payable to Tate in exchange for driving the sale price down by $3 million. Rex sought to enjoin the $1.5 million payment and brought a claim for breach of fiduciary duty against Tate and a claim for conspiracy against all of the defendants. Rex also alleged that Tate's co-defendants were joint tortfeasors for knowingly inducing and participating in Tate's breach of fiduciary duty and alleged personal jurisdiction under the Texas long-arm statute on the basis of business torts committed in whole or in part in Texas and under its joint tortfeasor theory. *See* Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2).

Appellees filed a special appearance, arguing that there was no nexus between them, Rex's allegations, and the forum; that Rex could not establish either specific or general jurisdiction over them;[4] and that Rex's Texas lawsuit was "pure gamesmanship" because Rex had also filed a lawsuit against Tate in Michigan on the same day that it filed the instant lawsuit. They contended that none of Rex's alleged injuries occurred in Texas, that the sale did not occur in Texas, and that the asset-purchase agreement at issue contained a Delaware forum selection clause.

The only witness to testify during the April 27, 2018 special appearance hearing was Rex Hansen, who had been Rex's administrative manager and who testified that Tate had been authorized to negotiate the sale of assets to Pregis and had negotiated with Bettegowda. Tate lived in Keller, Texas, managed Rex's sales around the

---

[4]The parties addressed only specific jurisdiction during the special appearance hearing and in this appeal.

3

country, and traveled to Michigan once a month in 2017 and 2018 but primarily worked in Texas.

Hansen identified in Plaintiff's Exhibits 9 and 10 photographs he had taken of a building that he said was "the Pregis location in Corsicana[,] Texas." The trial court admitted the photographs into evidence over Appellees' objections. Hansen testified that he was familiar with Pregis's logo and that the logo on the building was the same logo of the company that had purchased Rex's assets. The trial court also admitted into evidence Plaintiff's Exhibit 12, a print-out from a Pregis website that announced, "Pregis Acquires Rex Performance Products." During cross-examination, Hansen said that he took the photographs in Plaintiff's Exhibits 9 and 10 a week before the hearing but had not been inside that Pregis location and did not know if it was operational or an empty building. He also admitted that he did not know which legal entity owned or operated the building and did not dispute that the Pregis entity sued in the instant lawsuit was formed in February 2018.

With regard to Plaintiff's Exhibit 11, Rex's counsel asked Hansen if he was familiar with how Rex's email was managed, and Hansen explained that Rex had a server in Michigan that ran Microsoft Exchange and that "everybody use[d] their phone and/or Outlook to get and receive emails." Hansen said that he was familiar with the January and February 2018 email exchanges between Bettegowda and Tate that were contained in Plaintiff's Exhibit 11. The following recitation ensued:

4

Q. Are these emails business records for Rex Performance Products?

A. They are.

Q. And were these records made and kept in the course of a regular conducted business activity?

A. They are.

Q. Are these records routinely made and kept in the course of Rex's business?

A. Yes, they are.

Q. And were they made at or near the time of the event that they record?

A. They were.

Q. And were they made by people with knowledge of events, in particular Don Tate, as it relates to the events depicted there?[5]

---

[5]Under the business records exception to the hearsay rule, a record of an act, event, condition, opinion, or diagnosis is not excluded if:

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted business activity;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by an affidavit or unsworn declaration that complies with Rule 902(10); and

(E) the opponent fails to demonstrate that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. "Business" as used in this paragraph includes

Appellees' counsel then objected to speculation, and the trial court agreed, stating, "Yeah, how does he know that?" with regard to whether the emails were made at or near the time of the event they recorded.

Hansen replied that the emails "were sent under Don Tate's email account," that they had time stamps, and that the email system accurately recorded those time stamps as emails were sent back and forth. The trial court then challenged Hansen's knowledge of how the email exchange system accurately recorded time. Hansen testified that he used the email system, that in the process of going through the server exchange, an email was given a time and date stamp recorded within the server exchange, that he had not found there to be errors at any time with the time-and-date-stamp system, and that the server exchange system accurately recorded the "to and from" and "CC and BCC." The trial court sustained Appellees' objections to speculation and lack of foundation, stating, "I don't think he's qualified to tell how the time stamp works, how it goes through the server[,] and how it puts a time stamp on there."

The trial court also asked how an email was a business record, and Rex's counsel replied, "Well, it's an email that is prepared by the person that's an employee

every kind of regular organized activity whether conducted for profit or not.

Tex. R. Evid. 803(6).

6

of the company." The trial court observed that an email could be, but not necessarily was, a business record, depending on its content, and sustained Appellees' objections to hearsay and relevance.

After the trial court sustained Appellees' hearsay and relevance objections, Hansen testified that there were more than fifty emails, that he had reviewed the emails' subject matter, and that the emails evidenced a systematic conversation between Bettegowda and Tate regarding the asset purchase negotiation. Rex also offered, and the trial court admitted over Appellees' objection, Plaintiff's Exhibit 7, a February 23, 2018 agreement between Tate and Pregis, signed by Bettegowda as Pregis's vice president, in which Pregis promised Tate a bonus of $832,041, to be paid in three equal installments, as long as he remained employed with Pregis by February 22, 2019.

The trial court granted the special appearance.

## III. Discussion

### A. Plaintiff's Exhibit 11

In its second issue, Rex argues that the trial court abused its discretion by excluding Plaintiff's Exhibit 11 when "[t]he evidence contained in . . . Exhibit 11 was properly admissible as evidence as a business record."[6] However, Rex does not

---

[6]Rex also argues that the emails contained in Plaintiff's Exhibit 11 were admissible as statements against interest made by party opponents, but it did not make this argument in the trial court. *See* Tex. R. App. P. 33.1.

complain about the trial court's having sustained Appellees' relevance objection to Plaintiff's Exhibit 11. When an appellee objects to evidence on several independent grounds and, on appeal, the appellant complains of the exclusion of the evidence on only one of those grounds, the appellant waives any error by failing to challenge all possible grounds for the trial court's ruling that sustained the objection. *Idniarti v. Bell Helicopter Textron, Inc.*, No. 02-12-00045-CV, 2013 WL 1908291, at *1 (Tex. App.—Fort Worth May 9, 2013, pet. denied) (mem. op.); *In re Blankenship*, 392 S.W.3d 249, 259 (Tex. App.—San Antonio 2012, no pet.); *see Spa Castle, Inc. v. Miura N. Am., Inc.*, No. 02-16-00024-CV, 2017 WL 817149, at *1 (Tex. App.—Fort Worth Mar. 2, 2017, no pet.) (per curiam) (mem. op.) (holding that Spa Castle waived error complaining about exclusion of its evidence "[b]ecause Spa Castle has not challenged any, much less all, possible grounds supporting the trial court's rulings sustaining Appellees' objections"); *see also Ex parte L.S.*, No. 02-18-00096-CV, 2019 WL 622587, at *2 (Tex. App.—Fort Worth Feb. 14, 2019, no pet.) (mem. op.) ("If an independent ground fully supports the complained-of ruling, but the appellant assigns no error to that ground, we must accept the validity of that unchallenged independent ground, and thus any error in the grounds challenged on appeal is harmless."); *Britton v. Tex. Dep't of Criminal Justice*, 95 S.W.3d 676, 681 (Tex. App.—Houston [1st Dist.] 2002, no pet.) ("Generally speaking, an appellant must attack all independent bases or grounds that fully support a complained-of ruling or judgment."). Accordingly, we overrule Rex's

second issue without reaching the merits of the hearsay issue. *See* Tex. R. App. P. 47.1.

## B. Special Appearance

In its first issue, Rex argues that the trial court erred by granting the special appearance because it presented sufficient evidence that the non-Texas-resident Appellees were joint tortfeasors who knowingly induced, encouraged, and participated in Tate's breach of fiduciary duty. Appellees respond that Rex neither alleged nor established purposeful contacts with the forum, that Texas precedent rejects Rex's co-conspirator and joint liability theories of personal jurisdiction, and that Rex failed to show that the exercise of jurisdiction comports with due process requirements of fair play and substantial justice.

Whether a court has personal jurisdiction over a defendant is a question of law. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). When, as here, a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied. *Id.* at 795. But when the appellate record includes both the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Id.* Further, when jurisdictional facts are undisputed, it is a question of law as to whether those facts establish jurisdiction; the reviewing court "need not consider any implied findings of fact" and will consider

9

only the legal question of whether the undisputed facts establish Texas jurisdiction. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018).

Texas courts may exercise personal jurisdiction over a nonresident if "(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013) (quoting *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007)); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 17.042. The plaintiff bears the initial burden of pleading allegations sufficient to permit a court's exercise of personal jurisdiction over the nonresident defendant, and once the plaintiff meets this burden, the defendant then assumes the burden to negate all potential bases for personal jurisdiction that exist in the plaintiff's pleadings. *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016) (citing *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009)). The defendant can meet this burden to negate jurisdiction by showing that "even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction" or that "the defendant's contacts with Texas fall short of purposeful availment." *Bell*, 549 S.W.3d at 559 (quoting *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010)). If the defendant presents evidence that effectively disproves the plaintiff's allegations, the plaintiff may then provide evidence to prove its jurisdictional allegations. *Kelly*, 301 S.W.3d at 659.

To establish personal jurisdiction over a nonresident, federal due process requires that the nonresident have certain minimum contacts with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Bell*, 549 S.W.3d at 559 (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)). A defendant establishes minimum contacts with a state when it "'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws'" and thus justifying "'a conclusion that the defendant could reasonably anticipate being called into a Texas court.'" *Id.* (quoting *Retamco*, 278 S.W.3d at 338). Only the defendant's contacts with the forum are relevant; the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated; and the defendant must have sought some benefit, advantage, or profit by availing itself of the jurisdiction. *Id.* (quoting *Moncrief Oil*, 414 S.W.3d at 151).

Further, with regard to specific jurisdiction, the cause of action must arise from the defendant's contacts with the forum, and we must focus on the relationship between the forum, the defendant, and the litigation. *Id.* (citing *Moncrief Oil*, 414 S.W.3d at 150; *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 795 (Tex. 2005)). When communications between a nonresident and a resident are alleged as the basis for jurisdiction, we look to the quality and nature of the communications to establish purposeful availment. *Id.* at 560 (noting that changes in technology may render reliance on phone calls obsolete as proof of purposeful availment); *see Riverside*

11

*Exports, Inc. v. B.R. Crane & Equip., LLC*, 362 S.W.3d 649, 655 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) ("Like telephone calls, emails do not necessarily indicate anything to the recipient about the sender's location. The physical address where one may send or retrieve an email is no more fixed to a particular location than the address where one may send or receive a telephone call."). This court has already questioned whether an email can be sent to a particular state when email is not sent to a designated computer or electronic device located in a particular place. *EnerQuest Oil & Gas, L.L.C. v. Antero Res. Corp.*, No. 02-18-00178-CV, 2019 WL 1583921, at *7 (Tex. App.—Fort Worth Apr. 11, 2019, pet. filed) (mem. op. on reh'g) (noting that email is sent into cyberspace, saved onto one or more servers, and retrieved "by the recipient wherever that person may happen to be at the given time, whether in Texas, Tennessee, or Tibet").

Furthermore, a proper minimum contacts analysis must look to the defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there. *Bell*, 549 S.W.3d at 561 (citing *Walden v. Fiore*, 571 U.S. 277, 285, 134 S. Ct. 1115, 1122 (2014)). In *Bell*, the court stated that it would not determine in the special appearance context whether a transaction was fraudulent because that determination involved the lawsuit's merits; instead, the jurisdictional focus was on the nonresident defendant's contacts with the forum, including whether the nonresident defendant had transferred an interest in Texas real property or merely a fungible good, e.g., money. *Id.* at 563–64 (holding that the trial court did not err by

granting special appearance when nonresident defendant did not purposefully avail herself of Texas by speaking to her Texas resident co-defendant by phone on a weekly basis, by holding a lien on three Texas vehicles, and by sending transfers of money to the Texas resident).

Rex argues that the trial court had specific personal jurisdiction over Appellees because it made a prima facie showing that they committed a tort in Texas. Rex alleged conspiracy and breach of a fiduciary duty. *See Miles v. Barton*, No. 01-16-00288-CV, 2017 WL 711745, at *6 n.8 (Tex. App.—Houston [1st Dist.] Feb. 23, 2017, no pet.) (mem. op.) (focusing on minimum contacts for tortious interference with contract when same alleged underlying conduct gave rise to claim for breach of fiduciary duty). However, the mere existence of a cause of action against a defendant is not enough; the plaintiff is required to plead—and when challenged by the defendant, present evidence—that the defendant's relevant acts connected to the plaintiff's claims occurred, at least in part, in Texas. *See id.* at *6 (citing *Kelly*, 301 S.W.3d at 660–61). And the supreme court has declined to recognize the assertion of personal jurisdiction over a nonresident defendant based solely on the effects or consequences of an alleged conspiracy with a resident in the forum state. *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995) (orig. proceeding);[7] *see also Bell*,

_____

[7]In *Gibson*, the court restricted its inquiry to whether National Industrial Sand Association (NISA) "itself purposefully established minimum contacts such as would satisfy due process" and concluded that it had not, under either specific or general jurisdiction theories, when the undisputed evidence showed that NISA was not and

13

549 S.W.3d at 560 ("The mere existence or allegation of a conspiracy directed at Texas is not sufficient to confer jurisdiction.").

Rex's pleadings alleged that after the collapse of the initial negotiations between Rex, a Michigan LLC, and Pregis, a Delaware LLC with its principal place of business in Illinois, Pregis directly approached Tate, a Texas resident and Rex's president and CEO, and in January 2018, Tate flew to Chicago to meet with Pregis personnel. Rex alleged that Tate then secretly negotiated the "super bonus" side deal via email in January 2018 with Bettegowda, a Connecticut resident who acted on behalf of Pregis. Hansen's affidavit, attached to Rex's petition, attempted to sponsor eleven pages of emails, many of which were duplicated in Plaintiff's Exhibit 11, which the trial court did not admit into evidence at the hearing.[8] In his affidavit, Hansen stated that Tate

_____

never had been a Texas resident; was not required to and had never maintained a registered agent for service in Texas; did not maintain and had never maintained a place of business in Texas; did not have and had never had any employees or agents in Texas; had never maintained an office, mailing address, or phone number in Texas; had never owned any assets in Texas or paid any taxes in Texas; had never maintained a bank account in Texas; had never owned, leased, rented, or controlled any real or personal property in Texas; had never purchased any tangible items or other personal property in Texas or from a Texas business, citizen, or resident; had never entered into a contract with any Texas business, citizen, or resident; had never held a board of directors, officers, or other official meeting in Texas; and NISA's only contacts with Texas were limited to various correspondence with a Texas defendant that failed to demonstrate sufficient contact with the state for personal jurisdiction. 897 S.W.2d at 772–73, 776.

[8]Unduplicated emails attached to Rex's original petition include a January 15, 2018 exchange between Hansen and Tate regarding ownership shares of Rex and a January 21, 2018 exchange about the super bonus between Tate and another Rex employee, using the Rex email system.

14

had total control over negotiating the asset purchase agreement. Hansen acknowledged on cross-examination that the Pregis entity that Rex had sued was not formed until February 2018.

Nothing in the record reflects that Bettegowda's alleged January 2018 communications with Tate did anything to purposefully avail Bettegowda—or the entity he represented before Pregis was formed—of Texas as a forum, that Appellees' acts caused Rex, a Michigan LLC, to suffer harm in Texas, or that Appellees had any contacts with Texas that would have given rise to the causes of action here. *See Gibson*, 897 S.W.2d at 771–73, 776. To the contrary, per Hansen's testimony, the Pregis entity that Rex sued did not exist during most of Bettegowda's negotiations with Tate, and although Rex offered and the trial court admitted into evidence two photographs of a Pregis location in Corsicana, Hansen admitted that he took the photos a week before the April 27, 2018 hearing and that he lacked any personal knowledge of what legal entity owned or operated the facility.[9] None of the undisputed facts establish specific jurisdiction in Texas, and the trial court's implied findings likewise support the order granting the special appearance. *See BMC*, 83 S.W.3d at 794–95; *see also Bell*, 549 S.W.3d at 558. Accordingly, because the record does not reflect that Appellees had sufficient minimum contacts with Texas for the

_____

[9]During the hearing, the trial judge stated, "I'm actually pretty shocked that [Rex's counsel] would put on evidence that that's the Pregis, and he doesn't even know. I mean, that's a little disingenuous, I think to the Court, other than - - I mean, you ought to do a little research before you put that on."

trial court to exercise personal jurisdiction over them, the trial court did not err by granting the special appearance, and we overrule Rex's first issue.

## IV. Conclusion

Having overruled both of Rex's issues, we affirm the trial court's order.


/s/ Ruben Gonzalez
Ruben Gonzalez
Visiting Judge

Delivered: August 22, 2019