**Opinion issued August 28, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00634-CV

————————————

**TRIPLE G VENTURES LLC AND ROBERT D. SMITH, Appellants**

**V.**

**THOMAS WANG, AARON BOESKY, SHARON SO, AND AT GEKKO, LLC, Appellees**

---

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-09695**

---

## MEMORANDUM OPINION

Appellants Triple G Ventures and Robert D. Smith sued nonresidents Thomas Wang, Aaron Boesky, Sharon So, and AT Gekko, LLC for breach of contract, fraud, breach of fiduciary duty, conspiracy, and breach of the Securities Act of 1933 based on an investment transaction. The appellants maintain that the

trial court has personal jurisdiction over the nonresident appellees because they reached out to Texas residents to solicit investment in a risky business deal.

The appellees assert that the parties' communications about the investment arose fortuitously. They argue that the jurisdictional evidence does not show either that they purposefully availed themselves of the privilege of doing business in Texas or that the appellants' claims are related to the appellees' contacts with Texas. Thus, the appellees maintain that the exercise of personal jurisdiction is not proper in this case. The trial court agreed with the appellees, and so do we.

Accordingly, we affirm the trial court's grant of the appellees' special appearance and dismissal of all the appellants' claims against them.

**Background**

## I. Wang and Boesky raise capital for a small clean-energy company.

Heliogen was a privately-held, California-based clean energy company that was incorporated in Delaware. Heliogen was founded by Bill Gross, "one of the world's most successful entrepreneurs," and backed by private investors, including Microsoft Corporation co-founder, Bill Gates. In early 2021, Heliogen sought to raise $75 million through a Simple Agreement for Future Equity ("SAFE").

2

Heliogen was also planning to go public, possibly through a merger with a special purpose acquisition company, or "SPAC."[1]

Investors Thomas Wang, who lives in Puerto Rico, and Aaron Boesky, who lives in Hong Kong, have experience in startup technology companies, venture capital, asset management, and hedge fund management. In order to invest in Heliogen, Wang and Boesky created two companies: A. T. Gekko, LLC ("AT Gekko") and AT Gekko SPV1, LLC ("SPV1"). Both were Delaware corporations, with their principal place of business in Pennsylvania. AT Gekko was the manager of SPV1 and provided investment and investment-related services to SPV1.[2] Wang and Boesky planned to raise over $10 million in the Heliogen SPV, which they hoped would realize a positive return by selling shares of stock when Heliogen eventually went public.

AT Gekko would receive a standard 2% up-front fee for management, and SPV1 retained a 20% carried interest in distributions. All investors in SPV1 signed both an LLC Agreement and a Subscription Agreement. Wang and Boesky, on behalf of AT Gekko, solicited investments in SPV1 based on an offering memo

---

[1]    Heliogen merged with Athena Technology Acquisition Corp. (the 'SPAC') on December 30, 2021. The merged company was also called "Heliogen."

[2]    Sharon So, who also lived in Hong Kong was the executive assistant for AT Gekko.

that explained the investment opportunity, the details of the investment scheme, its risks, and their conflicts of interest.

## II.     Wang and Boesky meet Smith and Casey, who decide to invest in SPV1.

Early 2021, Chris Zaber introduced his childhood friend, Wang, to his colleague, Robert Smith, who lives in Dallas, Texas.[3] Zaber connected them because they both collect sports cards. Smith and Wang began communicating by telephone, text, email, and WhatsApp.

According to Smith, their conversations "quickly turned to [Wang's] new venture, which was raising money for a company called Heliogen." In his deposition,[4] Smith testified that it was possible that he had asked Wang about his business. Smith was interested in investing in Heliogen; Wang introduced Smith to Boesky; and all of them discussed the opportunity.

Smith and Wang had a text conversation about the investment on February 15, 2021. Wang told Smith that he had increased his personal investment to "1m" based on information he received that the SPAC merger would occur "probably in 4-6 weeks instead of 3-6 months." Smith asked where "the entity" was based, what its "take" was, and Wang's relationship to it. Wang told him that it was in

---

[3]     The limited jurisdictional evidence does not demonstrate exactly when Zaber introduced Smith and Wang.

[4]     The trial court permitted jurisdictional discovery, including limited party depositions.

Pittsburgh, the "take" was "2/20," and that he was a partner in the "entity." Wang also told Smith, "It's oversubscribed, if you want less or back out it's ok. There is [sic] people that actually want more right now." Smith then asked Wang how confident he was that Heliogen would IPO "trading publicly in the next 6 months" and whether he would be able to sell the shares as he wished once it was public. Wang told him that he was confident enough that he was "putting in 1m," but he cautioned Smith, "If you're concerned you don't have to invest[.] I don't want you to feel like you need to." Wang twice told Smith that he would be able to sell his shares "after the lockup." Finally, Smith told Wang that his friend, Kevan Casey, also wanted to invest $200K, and he gave Wang Casey's email.

About twenty minutes later, according to the text message and email time stamps, Wang sent an email to Smith, Casey, and Sharon So, the executive assistant for AT Gekko. In the email, Wang directed So to send Casey "documents for Heliogen investment." Less than 24 hours later, Casey sent to Wang and So, by email, signed copies of the Subscription Agreement and the SPV1 LLC agreement, both of which were required for investment in SPV1.[5] Casey signed on behalf of "Triple G Ventures, LLC," a Wyoming company that Casey used for investment

---

[5]    In his deposition, Casey said that he first heard about AT Gekko from Smith in 2021, and that he may have spoken to Smith multiple times before having an introductory call with Boesky. Casey said that Boesky later pursued him to work as an investment consultant. Casey funded Triple G's SPV1 investment from a "Texas" Bank of America account because although he was semi-retired, he considered Texas his principal place of business for investing through Triple G.

purposes. In the transmittal email, Casey stated: "[Smith] emailed these to me and I filled them out. Please confirm you have everything that you need. Upon receipt of the countersigned docs then I will immediately wire. Thanks!" That same day, February 16, 2021, Smith signed both the subscription agreement and the SPV1 LLC agreement.

Smith's signed documents showed a Dallas, Texas address, and Triple G's documents (signed by Casey) showed a Houston, Texas address, even though Triple G is registered in Wyoming, and its articles of organization list an address in Cheyenne, Wyoming as its principal office. Smith, individually, and Casey, acting for Triple G, each indicated that they wished to purchase 200 units of SPV1 for a total cost of $200,000 each. Wang countersigned the SPV1 LLC agreement on February 23, 2021.

## III. Heliogen share prices drop before SPV1 distributes shares, and Smith and Triple G file suit.

The SPAC merger closed in December 2021, but AT Gekko did not distribute shares of Heliogen to Smith and Triple G immediately. The jurisdictional evidence demonstrates that there were emails and other communications in late December and early January, many of which concerned the existence and timing of a lockup, a period when certain early investors and insiders would not be permitted to trade shares of Heliogen. By the time Triple G and Smith received their shares of the merged Heliogen stock, the price per share had dropped below their initial

6

investment. They sold the stock at a loss and sued appellees Wang, Boesky, AT Gekko, and So, none of whom are Texas residents. Triple G and Smith alleged that AT Gekko improperly waited to distribute their shares of Heliogen after it went public in order to maximize the 20% carried interest; that Wang, Boesky, and So made fraudulent statements about a lockup; and that AT Gekko did not properly calculate the fees it collected on Triple G and Smith's investment in SPV1.

Triple G and Smith asserted that the court had personal jurisdiction over the appellees because they had reached out to Texas residents—Smith and Casey—to solicit investment in SPV1. Appellants rely on numerous communications, some allegedly fraudulent, about this investment to support the trial court's exercise of specific personal jurisdiction.

In a verified special appearance, the appellees argued that the inception of the investment arrangement was fortuitous, growing out of discussions between Wang and Smith over an unrelated shared interest. The appellees denied that any of their activities created a substantial connection with Texas, and they argued that assertion of personal jurisdiction would not comport with traditional notions of fair play and substantial justice. The appellees supported their special appearance with jurisdictional evidence that included:

- excerpts from jurisdictional depositions of Casey, Smith, and So;

- emails among Wang, So, AT Gekko, Casey, and Smith about Smith and Triple G's investment, the lockup period, and distribution of shares;

7

- a redacted statement for Triple G's Bank of America checking account, which showed a Delaware business address for Bank of America, a Florida customer service address for Bank of America, and a Texas address for Triple G;

- copies of the SPV1 LLC agreement and subscription agreement signed by Smith and by Casey on behalf of Triple G and providing, in part, for communications by email, the application of Delaware law, and Smith's and Triple G's addresses;

- signature and execution pages for the subscription and LLC agreements showing Wang's countersignature on behalf of AT Gekko;

- a Confidential Private Placement Memorandum, summarizing the deal, including risks and conflicts of interest;

- the plaintiffs' second amended petition;

- text messages between Smith and Wang; and

- the Articles of Organization for Triple G, showing its registration and principal place of business in Wyoming.

Smith and Triple G supported their response with jurisdictional evidence, including:

- excerpts from depositions of Smith, Casey, Boesky, and Wang, who testified as a representative of AT Gekko;

- a declaration from Bill Gross about the Heliogen investment and the SPAC merger; and

- emails about the SPV1 investment, the lockup, and distribution of shares, as well as an email from Boesky to Casey in March 2021 about working together in the future; and email from April 2021 from So to Boesky and Wang, copied to Smith, about a potential investment in SPV2 for a different company, Turntide Technologies;

- the SPV1 distribution notice;

8

- and duplicate copies of documents attached to the appellees' verified special appearance.

Granting the special appearance, the trial court agreed with the appellees. On appeal from the trial court's dismissal of Triple G and Smith's claims, so do we. The appellees' communications with Casey and Smith do not establish minimum contacts and the jurisdictional evidence supports a conclusion that there is not a substantial connection between the underlying facts of the claims and the State of Texas. We affirm the trial court's judgment.

## Analysis

The sole question presented in this case is whether the trial court erred by granting the appellees' special appearance. The answer to this question depends entirely on whether personal jurisdiction over the appellees exists here. Triple G and Smith alleged only specific personal jurisdiction, so we focus our analysis on that.

## I. We review a court's ruling on a special appearance de novo.

Whether a trial court has personal jurisdiction over a defendant is a question of law we review de novo, although the court may have to resolve questions of fact. *BRP-Rotax GmbH & Co. KG v. Shaik*, No. 23-0756, 2025 WL 1727903, at *3 (Tex. June 20, 2025) (citing *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018)); *see also LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341, 346 (Tex. 2023). When a trial court does not issue findings of fact when ruling on

a special appearance, all facts necessary to support the judgment and supported by the record are implied. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). These implied findings may be challenged on appeal for legal and factual sufficiency in the same way an appellate court reviews findings of fact at trial. *Bryan v. Gordon*, 384 S.W.3d 908, 913 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

## II. A shifting burden applies when personal jurisdiction is challenged.

Initially, the plaintiff has the burden to plead sufficient allegations to bring the nonresident defendant within the reach of the long-arm statute. *LG Chem*, 670 S.W.3d at 346. A nonresident defendant may then challenge a Texas court's personal jurisdiction over it by filing a special appearance. TEX. R. CIV. P. 120a. The nonresident defendant must then negate all alleged bases of personal jurisdiction on either a factual or legal basis. *LG Chem*, 670 S.W.3d at 346. Both the defendant in its special appearance and the plaintiff in its response may support their arguments with jurisdictional evidence. *Id.*

## III. A court must consider several factors, notably the defendant's actions, when determining whether personal jurisdiction exists in a particular case.

"A court must have personal jurisdiction over a defendant to issue a binding judgment." *LG Chem*, 670 S.W.3d at 346. Texas courts may exercise personal jurisdiction over a nonresident when (1) the Texas long-arm statute authorizes the

exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal due process guarantees. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021). "Federal due-process requirements limit a state's power to assert personal jurisdiction over a nonresident defendant." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007). "Personal jurisdiction is proper when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Personal jurisdiction may be general or, as is relevant to this case, specific. *See Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 592 U.S. 351, 358 (2021). A court exercising general personal jurisdiction may hear any and all claims against a nonresident defendant. *Id.* "Specific jurisdiction is different: It covers defendants less intimately connected with a [s]tate, but only as to a narrower class of claims." *Id.* at 359. A court exercising specific personal jurisdiction may hear claims that arise out of or relate to the nonresident defendant's contacts with the forum state. *Id.* at 359–60 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017)). In the context of specific personal jurisdiction, the "minimum contacts" standard requires that (1) the nonresident defendant has *purposefully availed* itself

11

of the privilege of conducting activities in the forum state, and (2) there exists a

"*nexus* between the nonresident defendant, the litigation, and the forum." *Luciano*,

625 S.W.3d at 14 (quoting *Moki Mac*, 221 S.W.3d at 579 (emphasis added)).

### A.    Purposeful Availment

We consider three factors to determine whether a nonresident defendant has

purposefully availed itself of the privilege of conducting activities in Texas:

> First, only the defendant's contacts with the forum are relevant, not
> the unilateral activity of another party or a third person. Second, the
> contacts relied upon must be purposeful rather than random,
> fortuitous, or attenuated. Thus, sellers who reach out beyond one state
> and create continuing relationships and obligations with citizens of
> another state are subject to the jurisdiction of the latter in suits based
> on their activities. Finally, the defendant must seek some benefit,
> advantage or profit by availing itself of the jurisdiction.

*Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013)

(emphasis added) (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278

S.W.3d 333, 338–39 (Tex. 2009)); *see Burger King Corp. v. Rudzewicz*, 471 U.S.

462, 473, 475 (1985). We consider all the evidence and focus on "the quality and

nature of the contacts, not the quantity." *Moncrief Oil*, 414 S.W.3d at 151. With

respect to a particular claim, the defendant's activities must be deliberate and

"justify a conclusion that the defendant could reasonably anticipate being called

into a Texas court." *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801,

806 (Tex. 2002) (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286,

297 (1980)).

Such deliberate activities could include exploiting a Texas market or communications. *See BRP Rotax*, 2025 WL 1727903, at \*4. When a plaintiff alleges that communications are the basis for personal jurisdiction, a reviewing court must consider the quality and nature of the communications to determine whether they constitute purposeful availment. *See Old Republic*, 549 S.W.3d at 560–61. "On their own, numerous telephone communications with people in Texas do not establish minimum contacts . . . ." *Id*. at 560. And the Texas Supreme Court has noted that "changes in technology may render reliance on phone calls obsolete as proof of purposeful availment," since a phone number no longer indicates anything about the location of a person receiving a call. *Id.* Moreover, "the plaintiff cannot be the only link between the defendant and the forum," and a proper "minimum contacts analysis looks to the defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014).

## B.     Nexus

The relatedness—or nexus—component of minimum contacts requires that there be a connection between the nonresident defendant's purposeful contacts with Texas and the plaintiff's suit. *Luciano*, 625 S.W.3d at 14. The relatedness inquiry requires that the suit "arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co.*, 592 U.S. at 362. "[S]pecific jurisdiction requires us to

analyze jurisdictional contacts on a claim-by-claim basis." *Moncrief Oil*, 414 S.W.3d at 150 (citing *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 660 (Tex. 2010)). Due to the difference between general jurisdiction and specific jurisdiction, "[i]f a defendant does not have enough contacts to justify the exercise of general jurisdiction, the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts." *Id.* (citing *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274–75 (5th Cir. 2006)). "A court, however, need not assess contacts on a claim-by-claim basis if all claims arise from the same forum contacts." *Id.* at 150–51.

### C. Fair Play and Substantial Justice

"Once minimum contacts have been established, we must still consider whether, for other reasons, exercising jurisdiction over the nonresident defendant would nevertheless run afoul of 'traditional notions of fair play and substantial justice.'" *Luciano*, 625 S.W.3d at 18 (quoting *Int'l Shoe*, 326 U.S. at 316). "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 878 (Tex. 2010) (quoting *Guardian Royal Exch. Assurance, Ltd. v. Eng. China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991)). "We consider the nonresident defendant's contacts in light of (1) the burden on the defendant; (2) the interests of

14

the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of several states in furthering fundamental substantive social policies." *Luciano*, 625 S.W.3d at 18

## IV. The appellees did not have sufficient minimum contacts to support the exercise of personal jurisdiction in Texas.

Triple G and Smith argue that the appellees had sufficient minimum contacts with Texas based on their communications relating to the SPV1 investment, on which they base their lawsuit. Considering only the appellees' actions, we disagree.

### A. Defendants' actions and the quality and nature of communications do not demonstrate personal jurisdiction.

First, the appellants argue that the appellees communicated with them by email, phone calls made to their Texas phones, and WhatsApp communications and video conferencing when they were in Texas. They also argue that the appellees sent documents to them in Texas. The jurisdictional evidence does not demonstrate that any of the appellees knew of Smith, Casey, or Triple G's locations before they received the signed subscription agreements and accompanying paperwork. In addition, the evidence shows that Triple G is not a Texas company but a Wyoming company.

Even if the appellees did know where the appellants were located, we must consider the quality and nature of the communications. *See Old Republic*, 549 S.W.3d at 560. Smith testified that that his first couple of conversations with Wang were about sports cards, and he said that he may have initiated a conversation with Wang about his business. And the appellants concede that some of the communications, after they signed the subscription agreements, were about having a continuing business relationship or investment in other companies. The appellants' lawsuit does not arise out of or relate to sports cards, unrelated investments, or a continuing business relationship. Thus, they do not support a finding of specific personal jurisdiction. *See Ford Motor Co*, 592 U.S. at 359.

Appellants argue that they executed the documents in Texas and were physically present in Texas when communicating with the appellees about the SPV1 investment. But we do not consider the appellants' actions in our analysis, only the actions of the appellees. But it is only the defendant's contacts with a forum state that relevant to specific personal jurisdiction. *See id.*; *Moncrief Oil Int'l*, 414 S.W.3d at 151.

The appellants argue that the appellees pursued them to pitch the investment deal, upon which their lawsuit is based. Smith testified that that his first couple of conversations with Wang were about sports cards, and he said that he may have initiated a conversation with Wang about his business. The record establishes that

16

Smith, not the appellees, initially pitched the idea to Casey, who forwarded a copy of the LLC Agreement and the Subscription Agreement to the appellees, signed on behalf of Triple G, before the appellees sent the documents to him. In addition, text messages in the record show Wang dissuading Smith from investing if he had misgivings. In short, the evidence supports a conclusion that the appellees did not pursue the appellants seeking an investment but that the communication was initially fortuitous and later consensual. Thus, this evidence does not show that the appellees reached out to Texas to create continuing relationships with citizens of Texas. *See Moncrief Oil Int'l*, 414 S.W.3d at 151.

**B.** **The contracts did not create continuing obligations involving multiple contracts over a long period of time.**

Relying on *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985), the appellants argue, however, that their contracts with the appellees are sufficient to show minimum contacts because the contracts created continuing obligations involving multiple contracts over many months related to Heliogen. This case is not like *Burger King*. In *Burger King*, a Michigan defendant sought and entered into a 20-year franchise agreement with Florida-based Burger King. 471 U.S. at 464–67. That agreement provided for ongoing receipt of "market research and advertising assistance; ongoing training in restaurant management; and accounting, cost-control, and inventory-control guidance." *Id.* at 464–65.

17

The SPV1 deal provided members with a passive investment giving them no right to comment or control anything with regard to Heliogen, and the deal contemplated that the investment would be liquidated by distribution and sale of shares of stock after Heliogen went public. The Supreme Court has held that an individual's contract with an out-of-state party alone cannot establish personal jurisdiction. *Id.* at 478. Here, the limited prior negotiations, as evidenced by the text messages in the record, and the limited anticipated future consequences of the contracts do not support a conclusion that the parties' contracts provide the minimum contacts necessary for specific personal jurisdiction. *See id.* at 479.

C.  **Neither the alleged fraudulent nature of the communications nor communications with other parties supports specific personal jurisdiction.**

Triple G and Smith argue that the appellants had sufficient minimum contacts with Texas to support the exercise of personal jurisdiction because their suit is based on the appellants' allegedly fraudulent statements. We cannot conflate the jurisdictional inquiry with the underlying merits of the case. *See Old Republic*, 549 S.W.3d at 560. "Jurisdiction cannot turn on whether a defendant denies wrongdoing—as virtually all will. Nor can it turn on whether a plaintiff merely alleges wrongdoing—again as virtually all will." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 791 (Tex. 2005). The fact that the appellees'

statements were allegedly fraudulent does not play a part in our specific jurisdiction analysis. *See id.*

The appellants also argue that the appellees pursued continuing business relationships and did business with other, unrelated parties in Texas. This implicates the relatedness inquiry. *See Luciano*, 625 S.W.3d at 14. Here, the appellants have never argued or pleaded that the court has general personal jurisdiction over the appellees. And in the absence of general jurisdiction, the exercise of specific jurisdiction must be limited to those claims arising out of the defendant's forum contacts. *Moncrief Oil*, 414 S.W.3d at 150. The lawsuit in this case alleges several causes of action based on the same underlying operative facts related to the SPV1 investment, the timing of distribution of Heliogen shares, and the fees paid to AT Gekko. Unrelated investment opportunities and unrelated investors are just that: unrelated. Thus, those contacts cannot support the court's exercise of specific personal jurisdiction in this case. *See id.*

**D. Appellees' actions were directed at Texans, not Texas.**

Finally, the appellants argue that the appellees directed their communications to Texas, sent the LLC Agreement and Subscription Agreement to them in Texas, profited from their investments in SPV1. We have explained that the evidence does not show that the appellees knew that they were communicating with anyone in Texas before they received the signed subscription agreements.

19

That includes the transmittal of the LLC and Subscription Agreements. We find the argument that the appellees profited from the SPV1 investment deal unhelpful to the jurisdictional analysis because a proper "minimum contacts analysis looks to the defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285. The Supreme Court has held: "Common sense and everyday experience suggest that, absent unusual circumstances, the bank on which a check is drawn is generally of little consequence to the payee" and "is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416–17 (1984). The record in this case does not show any such unusual circumstances that make the source of the money used for the investments an appropriate jurisdictional consideration. That is, the fact that the appellees allegedly profited from the SPV1 deal, when Smith and Casey wired money from bank accounts in Texas, is not a relevant jurisdictional contact.

## Conclusion

Considering the evidence and arguments as a whole, we conclude that appellees lack the minimum contacts necessary for a court to exercise specific personal jurisdiction in this case. Because we conclude that the appellees have not established minimum contacts with Texas, we do not need to consider whether the

exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *See Moki Mac*, 221 S.W.3d at 575; TEX. R. APP. P. 47.1. We hold that the trial court did not err by granting the special appearance and dismissing the appellants' suit against the appellees.

We affirm the judgment of the trial court.


Susanna Dokupil
Justice

Panel consists of Justices Guerra, Gunn, and Dokupil.