Justice Green delivered the opinion of the Court.
This personal-jurisdiction dispute arises from a series of money transfers between a Texas resident and a Louisiana resident in connection with the sale of Texas property. Old Republic National Title Insurance Company alleged that the transfers were fraudulent and sued Lisa Bell, a Texas resident, and Robin Goldsmith, a Louisiana resident, under the Texas Uniform Fraudulent Transfers Act. We must determine whether Texas courts have personal jurisdiction over Goldsmith based on her contacts with the state. We hold that Goldsmith did not purposefully avail herself of the state of Texas such that Texas courts may exercise personal jurisdiction over her as to Old Republic's claim. Accordingly, we affirm the judgment of the court of appeals.
I. Background
The underlying lawsuit involves the sale of Bell's residential property to Chitra Chandrasekaran on July 17, 2012, and Bell's subsequent transfer of the proceeds to Goldsmith. Over a year after the sale of the house, the United States government informed Chandrasekaren that it had a lien on the property, alleging that it was community property that belonged to both Bell and her ex-husband, Bruce Benson, and demanding payment in full to satisfy the lien. Old Republic, the title company that insured title for sale of the property to Chandrasekaran, paid the federal government $202,574.88 in exchange for release of the lien. Old Republic then sued Bell and Goldsmith, alleging that they had participated in a fraudulent-transfer scheme with its nexus in Texas.
Bell married Benson in April 2002. In October 2009, Benson pled guilty to a false claim against the United States and, as a result, the United States government garnished his property and placed a restitution lien against all of his property-actions that affected both Benson's separate property and community property held with Bell. Bell separated from Benson and filed for divorce in the spring of 2009, before Benson's conviction. After Bell separated from Benson, Goldsmith began wiring money to Bell in small amounts.[1] Bell *557 and Goldsmith maintain that these transfers were interest-free loans between close friends to help Bell pay for living expenses so she could go back to school in the wake of her divorce. After the divorce in 2011, Bell sold the house for $215,000 and transferred the proceeds-$202,574.88-to Goldsmith, purportedly to repay Goldsmith for her financial support over the years. The sale proceeds exceeded what Bell owed Goldsmith at that time; however, Bell and Goldsmith assert that they were not keeping track of the "bottom-line number" and that they intended to "work it out later." Goldsmith continued to wire money to Bell in small amounts for "living expenses." Some time later, Bell recorded a lien on her vehicle in Goldsmith's favor.[2] Goldsmith asserted in her deposition that this was done as an estate-planning measure after Bell was diagnosed with cancer.
Of course, Old Republic characterizes these transactions differently. It argues that "the transfer was part of a multi-year asset-shielding scheme Bell and Goldsmith orchestrated after the United States had garnished hundreds of thousands of dollars from Bell." Specifically, Old Republic argued in the trial court that Bell and Goldsmith defrauded Chandrasekaran and other creditors by representing that the house was Bell's separate property and was therefore not subject to the federal lien. Old Republic alleged that as part of the scheme to shield assets-including the house-from the federal lien, Goldsmith made at least eighty-one money transfers to Bell, Bell transferred the proceeds of the house to Goldsmith knowing that the federal lien had attached, Bell acted "with the intent to avoid satisfaction of the Federal Lien and to prevent Chandrasekaran from obtaining collection of her claim for reimbursement for payment of the Federal Lien in the amount of $202,574.88," and Goldsmith was a knowing participant in the scheme.
Importantly, the character of the house-as community property or as Bell's separate property-is disputed. Goldsmith argues that the house was Bell's separate property, and thus the federal lien never attached, so there could have been no fraud. As support, she presented evidence that Bell entered the contract for purchase and construction of the home and paid $5,000 in earnest money before her marriage to Benson, making it Bell's separate property under the inception-of-title doctrine. Moreover, in Bell's divorce from Benson, the court specifically found that the house was "confirmed as the separate property of Lisa Simone [Bell]." Old Republic counters that the house was community property because the purchase was completed after the marriage and the purchase deed listed the grantee as "Lisa S. Benson, a Married Woman."
In response to Old Republic's suit, Goldsmith filed a special appearance objecting to the court's jurisdiction over her. In her motion, she alleged that she had never been a resident of Texas, had never engaged in business in Texas, had never committed any tort in Texas, and did not maintain a place of business in Texas. She also alleged that Old Republic's claim against her did not arise from and was not related to any conduct purposefully directed toward Texas. In response, Old Republic *558 argued that the court had specific jurisdiction over Goldsmith because she was "the first transferee of the asset" under the Texas Uniform Fraudulent Transfers Act (TUFTA) when Bell transferred the sale proceeds to her. See TEX. BUS. & COM. CODE § 24.009(b). Old Republic contended that Goldsmith was aware of the judgment entered against Benson in favor of the United States, making her an insider for purposes of TUFTA.
The trial court heard Goldsmith's special appearance and stated at the close of the hearing that it would be granting Goldsmith's motion. Before the trial court signed a written order, Old Republic filed a third-amended petition and a motion urging the court to reconsider its ruling. In its third-amended petition, Old Republic alleged for the first time that, in addition to specific jurisdiction, the trial court had general jurisdiction over Goldsmith based on her making numerous money transfers to Bell, communicating with Bell consistently over the phone for years, and taking liens on Texas property (Bell's vehicles). The trial court held a hearing on the motion for reconsideration, but ultimately the court denied the motion and granted Goldsmith's special appearance, "even in light of the additional jurisdictional allegations."
The court of appeals affirmed the trial court's ruling, holding that "Goldsmith's contacts with Texas are too attenuated to constitute purposeful availment and her contacts with Texas were neither continuous nor systematic." 548 S.W.3d 1, 8, 2016 WL 7245700 (Tex. App.-Fort Worth 2016, pet. granted). We granted Old Republic's petition for review. 61 Tex. Sup. Ct. J. 139 (Dec. 5, 2017).
II. Personal Jurisdiction
The sole issue before us is whether Goldsmith's contacts with the state are sufficient to confer specific jurisdiction over her as to Old Republic's fraudulent-transfer claim. As a preliminary matter, Goldsmith argues that the third-amended petition, which was filed after the special appearance hearing and ruling, was erroneously considered by the trial court and that only the pleadings on file at the time of the hearing were properly before the court. Both the trial court and the court of appeals concluded that even assuming Old Republic's third-amended petition was properly considered, the court still did not have jurisdiction over Goldsmith. 548 S.W.3d at ----. We agree.
Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law that we review de novo. Moncrief Oil Int'l Inc. v. OAO Gazprom , 414 S.W.3d 142, 150 (Tex. 2013). When, as here, the trial court did not issue findings of fact and conclusions of law, all relevant facts that are necessary to support the judgment and supported by evidence are implied. BMC Software Belgium, N.V. v. Marchand , 83 S.W.3d 789, 795 (Tex. 2002). When jurisdictional facts are undisputed, whether those facts establish jurisdiction is a question of law. Tex. Dep't of Parks & Wildlife v. Miranda , 133 S.W.3d 217, 226 (Tex. 2004). The relevant facts in this case are undisputed, as Old Republic acknowledges; therefore, we need not consider any implied findings of fact and we consider only the legal question whether the undisputed facts establish Texas jurisdiction. See ids="9256802" index="6" url="https://cite.case.law/sw3d/133/217/#p226">id. ; Moncrief Oil Int'l Inc. , 414 S.W.3d at 150 n.4.
Texas courts may exercise personal jurisdiction over a nonresident if "(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." Id. at 149 ; Moki Mac River Expeditions v. Drugg , 221 S.W.3d 569, 574 (Tex. 2007). The long-arm statute is satisfied *559 by a defendant who "commits a tort in whole or in part in this state." TEX. CIV. PRAC. & REM. CODE § 17.042(2). However, allegations that a tort was committed in Texas do not necessarily satisfy the United States Constitution. Moncrief Oil Int'l Inc. , 414 S.W.3d at 149 ; Michiana Easy Livin' Country, Inc. v. Holten , 168 S.W.3d 777, 788 (Tex. 2005).
To establish personal jurisdiction over a nonresident, federal due process requires that the nonresident must have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement , 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting Milliken v. Meyer , 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940) ); accord Moki Mac River Expeditions , 221 S.W.3d at 575. A defendant establishes minimum contacts with a state when it "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Retamco Operating, Inc. v. Republic Drilling Co. , 278 S.W.3d 333, 338 (Tex. 2009) (citations omitted). Thus, the defendant's activities "must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." Id. (citations omitted). We consider three factors in determining whether a defendant purposefully availed itself of the privilege of conducting activities in Texas:
First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated .... Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.
Moncrief Oil Int'l Inc. , 414 S.W.3d at 151 (quoting Retamco Operating, Inc. , 278 S.W.3d at 338-39 ). A defendant's contacts may give rise to general or specific jurisdiction. Id. at 150. General jurisdiction is established by continuous and systematic contacts with a state, while specific jurisdiction exists when the cause of action arises from or is related to a defendant's purposeful activities in the state. Id. For a Texas court to exercise specific jurisdiction over a defendant, "(1) the defendant's contact with Texas must be purposeful, and (2) the cause of action must arise from those contacts." Michiana Easy Livin' Country, Inc. , 168 S.W.3d at 795. Thus, when analyzing specific jurisdiction, we focus on the relationship between the forum, the defendant, and the litigation. Moncrief Oil Int'l Inc. , 414 S.W.3d at 150.
In a challenge to personal jurisdiction, the plaintiff and the defendant bear shifting burdens of proof. Kelly v. Gen. Interior Constr., Inc. , 301 S.W.3d 653, 658 (Tex. 2010). The plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute. Id. Once it has done so, the burden shifts to the defendant to negate all bases of personal jurisdiction alleged by the plaintiff. Id. One way the defendant can meet this burden to negate jurisdiction is by showing that "even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction" or that "the defendant's contacts with Texas fall short of purposeful availment." Id. at 659.
A. Specific Jurisdiction
For a Texas court to exercise specific jurisdiction over a defendant, the defendant's purposeful contacts must be *560 substantially connected to the operative facts of the litigation or form the basis of the cause of action. Moki Mac River Expeditions , 221 S.W.3d at 585 ; Michiana Easy Livin' Country, Inc. , 168 S.W.3d at 795. On appeal, Old Republic alleges that Goldsmith made the following contacts with Texas:
• Goldsmith knowingly spoke with a Texas resident at least weekly for years before this suit was filed, planning how to deal with the situation caused by her husband's criminal conviction.
• Goldsmith made eighty-one transfers of funds to a Texas bank account, totaling more than $240,000 over a four-year period.
• Goldsmith knew those funds were going to a Texas resident and a bank account that was based in Texas.
• Goldsmith held a lien on three vehicles in Texas.
• Goldsmith knowingly accepted and deposited sales proceeds from a Texas resident derived from Texas real property, then transferred them back to her.
The mere existence or allegation of a conspiracy directed at Texas is not sufficient to confer jurisdiction. Nat'l Indus. Sand Ass'n v. Gibson , 897 S.W.2d 769, 773 (Tex. 1995). Moreover, "[j]urisdiction cannot turn on whether a defendant denies wrongdoing-as virtually all will. Nor can it turn on whether a plaintiff merely alleges wrongdoing-again as virtually all will." Michiana Easy Livin' Country, Inc. , 168 S.W.3d at 791. Thus, we have cautioned that we must not confuse "the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits." Searcy v. Parex Res., Inc. , 496 S.W.3d 58, 70 (Tex. 2016) (quoting Michiana Easy Livin' Country, Inc. , 168 S.W.3d at 790 ). We address the alleged contacts in turn.
1. Numerous Phone Calls
Old Republic asserts that Goldsmith "participated in hundreds of phone calls with a Texas resident during which Bell was worried about the federal government collecting on the Federal Lien." When communications between a nonresident and a resident are alleged as the basis for jurisdiction, we look to the quality and nature of the communications to establish purposeful availment. See id. at 74. On their own, numerous telephone communications with people in Texas do not establish minimum contacts, and we have noted that changes in technology may render reliance on phone calls obsolete as proof of purposeful availment. Michiana Easy Livin' Country, Inc. , 168 S.W.3d at 791 (reasoning that a "caller ID" number no longer necessarily indicates anything about the caller's location and questioning: "If jurisdiction can be based on phone conversations 'directed at' a forum, how does a defendant avail itself of any jurisdiction when it can never know where the other party has forwarded calls or traveled with a mobile phone?"); see also Alenia Spazio, S.p.A. v. Reid , 130 S.W.3d 201, 204 (Tex. App.-Houston [14th Dist.] 2003, pet. denied) (holding that "numerous telephone and facsimile communications with people in Texas relating to an alleged contract do not establish minimum contacts").
Additionally, to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation. Moki Mac River Expeditions , 221 S.W.3d at 585 ; see also Michiana Easy Livin' Country, Inc. , 168 S.W.3d at 795 (holding that to establish specific jurisdiction, the cause of action must arise from the defendant's contacts with Texas). Old Republic asserts that the phone calls relate to or form the basis of their claim because Bell *561 and Goldsmith talked about "planning how to deal with the situation caused by [Bell's] husband's criminal conviction." Goldsmith testified that she and Bell had known each other since the 1970s, are "very close friends," and are "pretty much like family." Thus, it is hardly out of the ordinary that they spoke frequently on the phone. Moreover, given the circumstances and the nature of their friendship, it is to be expected that they would have discussed Bell's situation.
The connection between the phone calls and the allegedly fraudulent money transfers seems to hinge on a but-for analysis (but for Goldsmith loaning money to Bell, Bell never would have sent the proceeds of the house's sale to Goldsmith), which we have rejected in the jurisdictional inquiry. See Moki Mac River Expeditions , 221 S.W.3d at 581. We held that the but-for approach was "too broad and judicially unmoored to satisfy due-process concerns." Id. (agreeing with courts that have criticized the but-for approach for its "seemingly unlimited jurisdictional reach" that "literally embraces every event that hindsight can logically identify in the causative chain"). We do not doubt that Bell and Goldsmith discussed the details of Bell's situation after her ex-husband was convicted of a federal offense, including the financial ramifications. However, Goldsmith's statements that they were "thinking ahead," "trying to plan," and "brainstorming" are a far cry from Old Republic's allegations that they were conspiring to fraudulently transfer Texas-based assets out of Texas to shield them from Bell's creditors. Thus, the argument that the calls are substantially connected to Old Republic's fraudulent-transfer claim is, at best, a stretch.
Even assuming that the phone calls were sufficiently connected to the claim, a proper minimum-contacts analysis looks to the defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there. Walden v. Fiore , 571 U.S. 277, ----, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014). The record contains no evidence-and in fact, Old Republic did not plead or attempt to prove-that Goldsmith initiated the calls with Bell. We could just as easily infer that Goldsmith merely accepted Bell's calls. However, our analysis of purposeful availment requires that a defendant "seek some benefit, advantage or profit by availing itself of the jurisdiction." Moncrief Oil Int'l Inc. , 414 S.W.3d at 151 ; Retamco Operating, Inc. , 278 S.W.3d at 339. We reject the notion that phone calls with a friend who happens to live in Texas are sufficient contacts with the forum state itself to confer jurisdiction, and under these facts, we see no evidence that Goldsmith ever sought a benefit, advantage, or profit from these calls.
2. Money Transfers to a Texas Resident
Old Republic asserts that Goldsmith directed money transfers to a Texas resident, knowing that the funds were going to a Texas resident and a bank account that was based in Texas.[3] Goldsmith responds that she "sat at a computer in Louisiana and paid Bell's debts and made some online transfers" to Bell's bank account. She argues that the contact is even more attenuated because Bell's bank, Bank of America, is a Delaware corporation with its headquarters in North Carolina.
*562 Again, we look only to Goldsmith's contacts with the state of Texas, taking care not to turn a jurisdictional inquiry into an analysis of the underlying merits. See Searcy , 496 S.W.3d at 70.
Generally, money sent to the forum state is not determinative in establishing that a defendant purposefully availed itself of Texas's jurisdiction. E.g. , Alenia Spazio, S.p.A. , 130 S.W.3d at 213 ; Shell Compañia Argentina de Petroleo, S.A. v. Reef Expl., Inc. , 84 S.W.3d 830, 839 (Tex. App.-Houston [1st Dist.] 2002, pet. denied). Our analysis of this case might be different if the defendant were a corporate lender distributing funds to Texas residents with the expectation of collecting interest. See Moncrief Oil Int'l Inc. , 414 S.W.3d at 151 (articulating the "benefit, advantage or profit" requirement); Searcy , 496 S.W.3d at 77 (holding that a connection between a resident and a nonresident was not random, fortuitous, or attenuated-and therefore was sufficient to establish purposeful availment-when such connection was part of a general plan to "use the Texas forum to make money"). However, what appears to be, in this case, a series of no-interest loans between friends fails to meet the requirement that a defendant seek to benefit from its contacts with the state, which is necessary to establish purposeful availment. See Moncrief Oil Int'l Inc. , 414 S.W.3d at 151.
Of course, Old Republic argues that the transfers were not so innocent in nature, but were instead part of a multi-year asset-shielding scheme. We recognize that a state has a special interest in exercising jurisdiction over those who commit torts within its territory. E.g. , Moncrief Oil Int'l Inc. , 414 S.W.3d at 152. However, that interest cannot and must not displace the purposeful-availment inquiry, and the mere allegation that a nonresident directed a tort from outside the forum against a resident is insufficient to establish personal jurisdiction. Id. (citing Michiana , 168 S.W.3d at 790-91 ). As we have explained, we may not determine the underlying merits in order to answer the jurisdictional question. Searcy , 496 S.W.3d at 70 ; Michiana Easy Livin' Country, Inc. , 168 S.W.3d at 790. Therefore, whether the transfers were no-interest loans or were in fact part of an elaborate conspiracy to defraud Bell's creditors, we limit our inquiry to Goldsmith's contacts with the state of Texas. We hold that the electronic transfer of money from Goldsmith's bank account to Bell's bank account-even when Goldsmith knew that Bell was a Texas resident-does not rise to the level of purposeful availment of the forum.
3. Liens on Three Vehicles
Goldsmith was identified as a lien holder on three vehicles: (1) a 2007 Lexus, (2) a 2006 Pontiac, and (3) a 2011 Nissan. The record indicates that Goldsmith knew about at least the lien on the Nissan, but we see no evidence that she requested the lien, prepared the documents, or filed the lien. The court of appeals noted that the only evidence regarding what Goldsmith knew about the nature of a potential lien comes from Goldsmith herself. 548 S.W.3d at ----. In her deposition, she testified that she did not know who prepared it, who filed it, or if it was even filed in Texas.[4] The conduct claimed *563 to satisfy a minimum-contacts analysis must arise out of the defendant's own actions, not the unilateral activity of another party or a third person. Moncrief Oil Int'l Inc. , 414 S.W.3d at 151. In this case, the record does not support the premise that Goldsmith took any action in relation to the liens.
Furthermore, to satisfy the requirements of specific jurisdiction, the cause of action must arise from the defendant's purposeful contacts with Texas and such contacts must not be too attenuated. Michiana Easy Livin' Country, Inc. , 168 S.W.3d at 795 ; see also Am. Type Culture Collection, Inc. v. Coleman , 83 S.W.3d 801, 806 (Tex. 2002) ("The purpose of the minimum-contacts analysis is to protect the defendant from being haled into court when its relationship with Texas is too attenuated to support jurisdiction."). Here, the evidence indicates that the first two liens (on the 2007 Lexus and the 2006 Pontiac) were created in 2010, almost two years before the home was sold, and both were released two months after they were created. The lien on the 2011 Nissan was created in October 2013, more than a year after the sale of the house and transfer of its proceeds. The only evidence about the nature of this lien is Goldsmith's deposition testimony that the lien was placed as an estate-planning measure after Bell was diagnosed with cancer. If any connection exists between these liens and the fraudulent-transfer scheme alleged by Old Republic, it is not apparent from this record. In any case, those contacts certainly are not substantially connected to the operative facts of the litigation such that the action arises from those contacts. See Moki Mac River Expeditions , 221 S.W.3d at 585 ; Michiana Easy Livin' Country, Inc. , 168 S.W.3d at 795.
4. Transfer of the House Sale Proceeds
At the crux of Old Republic's fraudulent-transfer claim is Bell's sale of the house and the subsequent transfer of those funds to Goldsmith. Old Republic argues:
Goldsmith knowingly accepted sales proceeds from Texas real estate. Goldsmith did not merely receive money, ignorant about its character or origin. Goldsmith took the voluntary action of depositing those funds from a Texas-based asset into her account. Although that action occurred in Louisiana, it traced its effect to Texas because it pulled money out of Texas and she knew it. This constitutes purposeful availment.
Once more, we look only to Goldsmith's contacts with the forum to determine if Goldsmith purposefully availed herself of the state of Texas. See Moncrief Oil Int'l Inc. , 414 S.W.3d at 151 ("[O]nly the defendant's contacts with the forum are relevant ...."). We do not determine whether or not the transaction was in fact fraudulent, as that gets to the merits of the lawsuit; regardless, Goldsmith's conduct with respect to this alleged contact was exclusively in Louisiana.
Old Republic suggests that Texas courts have consistently found personal jurisdiction to exist against a knowing participant in a fraudulent-transfer scheme, citing this Court's decision in Retamco Operating, Inc. , 278 S.W.3d at 339, and a court of appeals' case, Trigeant Holdings, Ltd. v. Jones , 183 S.W.3d 717 (Tex. App.-Houston [1st Dist.] 2005, pet. denied). We distinguish both of those cases because both *564 involve the transfer of Texas-based assets to an out-of-state defendant, rather than the transfer of money, a fungible asset. Retmaco Operating, Inc. involved the allegedly fraudulent transfer of oil and gas interests in Texas to a California corporation. 278 S.W.3d at 336. We held that "by taking an assignment of Texas real property, [the California corporation] reached out and created a continuing relationship in Texas." Id. at 339. Similarly, Trigeant Holdings, Ltd. involved the allegedly fraudulent transfer of an interest in a Corpus Christi refinery to two Florida entities. 183 S.W.3d at 722. The court of appeals in that case affirmed the trial court's exercise of personal jurisdiction, holding that "[b]y participating in a Texas transaction involving the transfer of Texas-based assets to allegedly defraud a Texas resident, the [Florida entities] purposefully availed [themselves] of the benefits and privileges of conducting business in Texas." Id. at 728. Thus, the determining facts in both cases were not simply the allegedly fraudulent transfers, but instead the transfers of Texas-based business operations and real property, which derive profit from Texas and create continuing connection with the state.
This case might have mirrored those cases if Bell had transferred an interest in the house itself to Goldsmith; however, she transferred a fungible asset-money-with no continuing presence in Texas, and the mere act of accepting the transfer of money drawn on a Texas bank is "of negligible significance for purposes of determining whether [a foreign defendant] had sufficient contacts in Texas." Helicopteros Nacionales de Colombia, S.A. v. Hall , 466 U.S. 408, 416-17, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Reversing this Court's holding, the United States Supreme Court held, "Common sense and everyday experience suggest that, absent unusual circumstances, the bank on which a check is drawn is generally of little consequence to the payee" and "is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." Id. Thus, even if Goldsmith's receipt of funds were part of an elaborate fraudulent-transfer scheme, her contacts do not establish purposeful availment of the state of Texas, and the appropriate judicial forum to address Old Republic's claims against Goldsmith is Louisiana.
B. Calder Effects Test
Old Republic urges us to adopt the "effects test" for determining specific jurisdiction, approved by the United States Supreme Court in Calder v. Jones . See 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (holding that California properly asserted jurisdiction over Florida-based defendants because the "brunt of the harm ... was suffered in California"). Calder involved a Florida-based, national newspaper that published an allegedly defamatory article about a California resident. Id. at 784-85, 104 S.Ct. 1482. The Supreme Court held that California properly exercised jurisdiction over the Florida defendants "based on the 'effects' of their Florida conduct in California." Id. at 789, 104 S.Ct. 1482. Central to that decision was the Supreme Court's conclusion that California was "the focal point both of the story and of the harm suffered." Id. at 789, 104 S.Ct. 1482.
The Supreme Court later clarified, however, that the test laid out in Calder requires that the "effects" of the alleged tort must connect the defendant to the forum state itself, not just to a plaintiff who lives there. Walden , 571 U.S. at ----, 134 S.Ct. 1115. Thus, our interpretation of Calder aligns with the Supreme Court's:
*565 "Mere knowledge that the 'brunt' of the alleged harm would be felt-or have effects-in the forum state is insufficient to confer specific jurisdiction." Searcy , 496 S.W.3d at 68-69 (citing Walden , 571 U.S. at ----, 134 S.Ct. 1115 ). Moreover, we have explicitly rejected an approach to specific jurisdiction that turns upon where a defendant "directed a tort" rather than on the defendant's contacts. See Michiana Easy Livin' Country, Inc. , 168 S.W.3d at 790-92. Accordingly, the "effects test" is not an alternative to our traditional "minimum contacts" analysis, and it does not displace the factors we look to in determining whether a defendant purposefully availed itself of the state.[5] We have already concluded that Goldsmith's contacts fall short of purposeful availment. At most, her alleged contacts connect her to Bell, a Texas resident. Therefore, even if a tort was committed and even if Goldsmith knew her actions would cause an injury in Texas, her contacts do not rise to the level of purposeful availment simply because the alleged harm occurred in Texas.
C. General Jurisdiction
A court has general jurisdiction over a nonresident defendant whose "affiliations with the state are so continuous and systematic as to render [it] essentially at home in the forum State." TV Azteca v. Ruiz , 490 S.W.3d 29, 37 (Tex. 2016) (quoting Daimler v. Bauman , 571 U.S. 117, 127, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014) ). Thus, general jurisdiction may be established whether or not the defendant's alleged liability arises from those contacts. Moki Mac River Expeditions , 221 S.W.3d at 575. We recognize the test for general jurisdiction as a "high bar," Searcy , 496 S.W.3d at 72, which presents "a more demanding minimum contacts analysis than for specific jurisdiction." TV Azteca , 490 S.W.3d at 37 (quoting BMC Software Belgium, N.V. , 83 S.W.3d at 797 ). Even when a defendant's contacts may be continuous and systematic, they are insufficient to confer general jurisdiction if they fail to rise to the level of rendering a defendant "essentially at home in the forum [s]tate." Searcy , 496 S.W.3d at 72 (quoting Daimler , 571 U.S. at 134, 134 S.Ct. 746 ).
Goldsmith testified in her deposition that she had never lived in Texas and had only visited twice in the past ten years, for reasons unrelated to Bell. Thus, her only contacts with the state were those involved in her relationship with Bell, which we have already determined were insufficient to confer specific jurisdiction. Even assuming that the question of general jurisdiction was properly before the trial court, we agree with the court of appeals' conclusion that "there is simply no evidence that Goldsmith made the necessary type of continuous and systematic contacts with Texas as to afford a Texas court general jurisdiction over her." --- S.W.3d at ----.
III. Conclusion
We hold that Goldsmith's contacts with the state of Texas are insufficient to confer specific or general jurisdiction over her as to Old Republic's alleged fraudulent-transfer claim. Our test for establishing purposeful availment has three factors: (1) we consider only the defendant's contacts with the forum; (2) those contacts must be purposeful *566 rather than random, fortuitous, or attenuated; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. Moncrief Oil Int'l Inc. , 414 S.W.3d at 151. Goldsmith's conduct did not meet those criteria. Therefore, the trial court did not err in granting Goldsmith's special appearance. We affirm the judgment of the court of appeals.

The record indicates that Goldsmith sent a regular monthly allowance of $3,000 for living expenses, as well as additional amounts for specific bills, typically ranging from $108 for life insurance to $5,200 for credit-card payments. A few larger transfers were made, including $10,000 for legal expenses and $23,000 for "IRS."

The record also indicates that liens on two other vehicles were recorded in Goldsmith's favor. However, they were both created and released roughly two years before the sale of the house.

In two separate points, Old Republic asserts that (1) Goldsmith made eighty-one transfers of funds to a Texas bank account, and (2) Goldsmith knew those funds were going to a Texas resident and a bank account that was based in Texas. We view those alleged contacts as essentially the same and combine them for purposes of our analysis.

The extent of Goldsmith's lack of knowledge or involvement with the lien was clear in her deposition:
Q: This Nissan that you took a lien on, that was a vehicle that was registered in Texas, correct?
A: If that's what you say.
Q: Do you have any reason to dispute that?
A: I do not.
Q: Would it be safe to say that you would assume that it was registered in Texas?
A: Yes.

To review, those factors are: (1) only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person; (2) the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. Moncrief Oil Int'l Inc. , 414 S.W.3d at 151.