Opinion issued August 29, 2025



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-23-00897-CV

_____

**FIGHT SPORTS LLC AND ROBERTO DE ABREU FILHO A/K/A ROBERTO "CYBORG" ABREU, Appellants**

**V.**

**MANDY SCHNEIDER, Appellee**

---

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-36632**

---

## MEMORANDUM OPINION

After appellee Mandy Schneider was sexually assaulted by her Brazilian jiu-jitsu instructor, she sued multiple defendants, including the instructor, the gym, and appellees Fight Sports LLC ("Fight Sports") and Roberto De Abreu Filho a/k/a

Roberto "Cyborg" Abreu. Fight Sports is a Florida company, and Abreu lives in Florida. The trial court denied their special appearance, and they appealed.

We conclude that the court lacks general personal jurisdiction over both Abreu and Fight Sports because their forum contacts do not demonstrate that either appellee is essentially at home in Texas. We further conclude that the court lacks specific jurisdiction over both Abreu and Fight Sports because there is no nexus among Fight Sports, Schneider's claims, and the State of Texas.

We reverse the trial court's order and render judgment dismissing Schneider's claims against Abreu and Fight Sports.

**Background**

When Schneider was about thirteen years old, she began Brazilian jiu jitsu training at a Rockstar Martial Arts franchise location in Frisco, Texas ("Rockstar"). Rodrigo Da Costa Oliveira worked as an instructor and coach for Rockstar. Oliveira had trained with and received his black belt from Abreu at a Fight Sports gym in Florida. In October 2020, when Schneider was sixteen years old, Oliveira drove her to Houston to compete in a jiu jitsu tournament. Entrance to the tournament was limited only to competitors associated with larger gyms, so—as is commonly done in the sport of Brazilian jiu jitsu—Rockstar paid a fee to Fight Sports in exchange for the right to compete under the Fight Sports "banner" and with a Fight Sports patch on Schneider's uniform.

When Schneider and Oliveira arrived in Houston, they checked into separate hotel rooms. Later that night, Schneider came to Oliveira's room to get bottled water from him. Oliveira coaxed her to stay and review fighting videos in advance of the next day's competition. According to Schneider's pleading, however, he gave her alcohol, sparred with her, and then raped her.

In the weeks immediately after the sexual assault, Schneider confided in two other Rockstar employees, who shamed her, suggested the assault was her fault, and pressured her not to report it. But about three weeks after the assault, Schneider told a third Rockstar employee, who got the franchise owners involved and encouraged Schneider to make a police report. Schneider then told her parents, who called the police.

Oliveira fled, and Schneider's father texted Abreu to inquire if he knew of Oliveira's whereabouts and his "work visa status with Fight Sports." Abreu responded: "As we know Rodrigo is already out of the country, I already disconnected him from the team. About the visa I spoke to the lawyer today and the procedure is I'll send a letter to the immigration breaking the Visa." Abreu then promptly sent a letter to United States Citizenship and Immigration Services (USCIS) saying that he was the owner and president of Fight Sports, three years prior he filed a petition to classify Oliveira as a Beneficiary in P-1 status, and

3

because Oliveira no longer worked "at Fight Sports," he requested withdrawal of his petition.

About two-and-a half years after the assault, Schneider filed suit against Oliveira, Rockstar, Abreu, Fight Sports, and others. She asserted claims for sexual assault, aggravated sexual assault, and assault and battery against Oliveira. She alleged the following claims against "all defendants": (1) agency, respondeat superior, and vicarious liability for Oliveira's actions; (2) negligent failure to protect;[1] (3) negligent hiring, retention, supervision, and training;[2] and retention based on the defendants' providing and allowing Oliveira "direct and continued access to minors" and failing to properly screen, hire, train, investigate, monitor, and supervise Oliveira; and (4) negligent failure to train or educate employees,

---

[1] Schneider alleged that all defendants failed to protect her from Oliveira's assault based, specifically, on Fight Sports and Abreu's prior knowledge of unrelated sexual assaults committed by instructors against students. She alleged that Fight Sports and Abreu had a duty to protect her against the risk of injury by instructors (including Oliveira), and they breached this duty by failing to adopt, implement, and enforce proper procedures.

[2] Schneider alleged that all defendants failed to properly screen, hire, and train their coaches (including Oliveira), they knew or should have known that Oliveira should not have been interacting with minors, and they provided Oliveira direct and continued access to minors while failing to adequately supervise him.

agents, representatives, and contractors.[3] Schneider's pleading included the following specific factual allegations about Fight Sports and Abreu:

- Fight Sports is a Brazilian jiu jitsu academy managed by Abreu with "affiliated gyms" in North and South America, Africa, and Europe.

- Abreu was Oliveira's jiu jitsu instructor, and he promoted Oliveira to black belt.

- "At some point, Defendant Abreu brought Defendant Oliveira to Texas where Defendant Oliveira became a Fight Sports affiliated instructor at a Rockstar Martial Arts gym, which was also affiliated with Fight Sports."

- After meeting with Schneider and learning of the sexual assault, the owners of the Frisco Rockstar franchise contacted Abreu and told him about the assault.

- After Schneider's father "insisted," Abreu wrote to USCIS saying that Oliveira "was no longer working at Fight Sports" and asking to withdraw his petition to classify Oliveira as a beneficiary for P-1 visa.

- After reporting the sexual assault, Schneider saw Abreu "at an event," but he "would only approach [her] when she was alone." Later, Abreu revoked Oliveira's black belt.

- Abreu knew that in 2018, a different Fight Sports instructor was charged with three counts of sexual assault of a minor student.

Fight Sports and Abreu filed a verified special appearance, which was supported by Abreu's affidavit. They argued that their only connection to Oliveira, and thus the underlying case, was that Oliveira had been a member of the Fight

---

[3] Schneider alleged that all defendants breached their duty to protect Plaintiff from sexual assault by Oliveira by failing to properly train or educate employees, agents, or independent contractors of Fight Sports and Rockstar.

Sports gyms in Florida and received his jiu jitsu black belt under Abreu's training.

Abreu's affidavit provided the following relevant facts and denials:

- Abreu is a seven-time world Jiu Jitsu No-Gi champion.

- Abreu is the manager of Fight Sports, which is a Florida LLC.

- Neither Fight Sports nor Abreu has ever actively advertised or marketed in Texas.

- Neither Fight Sports nor Abreu has any agents, franchises, independent contractors, or employees in Texas.

- Neither Fight Sports nor Abreu has any bank accounts or real property in Texas. Neither has leased real property in Texas. Neither has ever paid taxes to Texas.

- Neither Fight Sports nor Abreu renders "any training or business advice to Texas businesses."

- Abreu testified that "[d]uring my professional career, I have travelled all over the world to compete and to give seminars. I have been to Texas three-four times to give seminars. In those three-four instances, I was asked to travel to Texas to give the seminars. Only Fight Sports LLC received compensation for the seminars."

- Fight Sports has certified affiliated gyms, which are called "Fight Sports" gyms. None are in Texas. Rockstar is not a Fight Sports affiliated gym. Neither Fight Sports nor Abreu has "any ownership, interest, control or management of any Rockstar Martial Arts entity or its personnel." "There has never been a business relationship between Fight Sports LLC and Rockstar Martial Arts." Neither Fight Sports nor Abreu is responsible for hiring, training, supervising, or contracting Rockstar Martial Arts employees, agents, or contractors. Neither Fight Sports nor Abreu owns, controls, or directs day to day activities of Rockstar.

- "For the past thirty years, the national competitive martial arts community is structured in such a way that smaller gyms, such as

6

[Rockstar], can pay a nominal fee to larger organizations such as Fight Sports LLC, to participate in competitive events." The smaller jiu jitsu facilities across the world will pay a nominal fee in order to wear the Fight Sports logo at national competitions [like the one Schneider attended in October 2020]. "The sponsorship allows the smaller gyms to wear the Fight Sports logo and fly the Fight Sports banner at competitions . . . ."

- Neither Fight Sports nor Abreu "solicited, asked, targeted, or approached" Rockstar for them to use the Fight Sports logo or banner.

- Oliveira "was never any employee, agent, or contractor" of Fight Sports. He was not an instructor at any Fight Sports facility; he was "one of hundreds of members" of a Fight Sports gym in Florida, where he trained.

- Neither Fight Sports nor Abreu "brought Oliveira to Texas."

In Schneider's response to the special appearance, she argued that Fight Sports had purposefully availed itself of the privilege of doing business in Texas because it was a recognized international brand in martial arts. She argued that Fight Sports had earned about $41,150 over five years from the fees paid by Texas gyms for competition sponsorship and from seminars. She argued that Abreu had "competed numerous times in Texas and made tens of thousands of dollars from it."

In her response, Schneider embedded screen shots of posts, websites, and photographs showing Abreu with Oliveira and others from Rockstar in September 2019, a Rockstar advertisement for a seminar featuring Abreu in May 2021, and Rockstar web pages describing their instructors as brown or black belts in jiu jitsu

"under Fight Sports" or "under Roberto Cyborg Abreu of Fight Sports." She also included a screen shot showing that while Oliveira worked for Rockstar, he continued to compete under the Fight Sports banner. Schneider included a screen shot of text message between her father and Abreu about Oliveira's visa, as well as an image of the letter Abreu wrote to USCIS.

Based on these additional jurisdictional facts, she argued that Fight Sports employed Oliveira at the time of the sexual assault, and that both Fight Sports and Abreu had sufficient minimum contacts with Texas support the exercise of personal jurisdiction. In the alternative, she included in her response a request for a continuance to complete jurisdictional discovery, asserting that there were deficiencies in the appellants' responses to discovery.

After a brief oral hearing, the trial court denied the special appearance, and Fight Sports and Abreu appealed.

## Analysis

Fight Sports and Abreu present this Court with a single, familiar issue. They assert that the trial court erred by denying their special appearance and failing to dismiss Schneider's claims against them. We agree. As explained further below, neither the pleadings nor the jurisdictional evidence supports the exercise of general or specific jurisdiction over Fight Sports or Abreu.

8

**I.      We review a court's ruling on a special appearance de novo.**

Whether a trial court has personal jurisdiction over a defendant is a question of law we review de novo, although the court may have to resolve questions of fact. *BRP-Rotax GmbH & Co. KG v. Shaik*, 716 S.W.3d 98, 103 (Tex. 2025) (citing *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018)); *see also LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341, 346 (Tex. 2023). When a trial court does not issue findings of fact when ruling on a special appearance, all facts necessary to support the judgment and supported by the record are implied. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). These implied findings may be challenged on appeal for legal and factual sufficiency in the same way an appellate court reviews findings of fact at trial. *Bryan v. Gordon*, 384 S.W.3d 908, 913 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

**II.     A shifting burden applies when personal jurisdiction is challenged.**

Initially, the plaintiff has the burden to plead sufficient allegations to bring the nonresident defendant within the reach of the long-arm statute. *LG Chem*, 670 S.W.3d at 346. A nonresident defendant may then challenge a Texas court's personal jurisdiction over it by filing a special appearance. *See* TEX. R. CIV. P. 120a. The nonresident defendant must then negate all alleged bases of personal jurisdiction on either a factual or legal basis. *LG Chem*, 670 S.W.3d at 346. Both

the defendant in its special appearance and the plaintiff in its response may support their arguments with jurisdictional evidence. *Id.*

### III. A court must consider several factors, notably the defendant's actions, when determining whether personal jurisdiction exists in a particular case.

"A court must have personal jurisdiction over a defendant to issue a binding judgment." *LG Chem*, 670 S.W.3d at 346. Texas courts may exercise personal jurisdiction over a nonresident when (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal due process guarantees. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021). "Federal due-process requirements limit a state's power to assert personal jurisdiction over a nonresident defendant." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007). "Personal jurisdiction is proper when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Personal jurisdiction may be general or specific. *See Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 592 U.S. 351, 358 (2021). A court exercising general personal jurisdiction may hear any and all claims against a nonresident defendant. *Id.* "General jurisdiction is established by continuous and systematic

10

contacts with a state, while specific jurisdiction exists when the cause of action arises from or is related to a defendant's purposeful activities in the state." *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 559 (Tex. 2018).

A court may exercise general jurisdiction over a nonresident defendant whose "affiliations with the state are so continuous and systematic as to render [it] essentially at home in the forum State." *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016) (quoting *Daimler v. Bauman*, 571 U.S. 117, 127 (2014)). When a court has general jurisdiction, the alleged liability need not arise from the nonresident defendant's continuous and systematic contacts with the forum state. *Moki Mac*, 221 S.W.3d at 575. The test for general jurisdiction is a "high bar," and requires a more demanding analysis of the nonresident's contacts with the forum state than we employ with respect to specific jurisdiction. *Old Republic*, 549 S.W.3d at 565. "Even when a defendant's contacts may be continuous and systematic, they are insufficient to confer general jurisdiction if they fail to rise to the level of rendering a defendant *essentially at home* in the forum [s]tate." *Id.* (internal quotation omitted).

"Specific jurisdiction is different: It covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Ford Motor Co.*, 592 U.S. at 359. A court exercising specific personal jurisdiction may hear claims that arise out of or relate to the nonresident defendant's contacts with the forum

11

state. *Id.* at 359–60 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017)). In the context of specific personal jurisdiction, the "minimum contacts" standard requires that (1) the nonresident defendant has *purposefully availed* itself of the privilege of conducting activities in the forum state, and (2) there exists a "*nexus* between the nonresident defendant, the litigation, and the forum." *Luciano*, 625 S.W.3d at 14 (quoting *Moki Mac*, 221 S.W.3d at 579 (emphasis added)).

### A. Purposeful Availment

We consider three factors to determine whether a nonresident defendant has purposefully availed itself of the privilege of conducting activities in Texas:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Thus, sellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities. Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

*Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013) (emphasis added) (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338–39 (Tex. 2009)); *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 475 (1985). We consider all the evidence and focus on "the quality and nature of the contacts, not the quantity." *Moncrief Oil*, 414 S.W.3d at 151. With respect to a particular claim, the defendant's activities must be deliberate and

12

"justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002) (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Such deliberate activities could include exploiting a Texas market or communications. *See BRP Rotax*, 716 S.W.3d at 104. When a plaintiff alleges that communications are the basis for personal jurisdiction, a reviewing court must consider the quality and nature of the communications to determine whether they constitute purposeful availment. *See Old Republic*, 549 S.W.3d at 560. Moreover, "the plaintiff cannot be the only link between the defendant and the forum," and a proper "minimum contacts analysis looks to the defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014).

## B.    Nexus

The relatedness—or nexus—component of minimum contacts requires that there be a connection between the nonresident defendant's purposeful contacts with Texas and the plaintiff's suit. *Luciano*, 625 S.W.3d at 14. The relatedness inquiry requires that the suit "arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co.*, 592 U.S. at 362. "[S]pecific jurisdiction requires us to analyze jurisdictional contacts on a claim-by-claim basis." *Moncrief Oil*, 414

13

S.W.3d at 150 (citing *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 660 (Tex. 2010)). Due to the difference between general jurisdiction and specific jurisdiction, "[i]f a defendant does not have enough contacts to justify the exercise of general jurisdiction, the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts." *Id.* (citing *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274–75 (5th Cir. 2006)). A court, however, "need not assess contacts on a claim-by-claim basis if all claims arise from the same forum contacts." *Id.* at 150–51.

## C.    Fair Play and Substantial Justice

"Once minimum contacts have been established, we must still consider whether, for other reasons, exercising jurisdiction over the nonresident defendant would nevertheless run afoul of 'traditional notions of fair play and substantial justice.'" *Luciano*, 625 S.W.3d at 18 (quoting *Int'l Shoe*, 326 U.S. at 316). "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 878 (Tex. 2010) (quoting *Guardian Royal Exch. Assurance, Ltd. v. Eng. China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991)). "We consider the nonresident defendant's contacts in light of (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining

14

convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of several states in furthering fundamental substantive social policies." *Luciano*, 625 S.W.3d at 18.

## IV. Personal jurisdiction does not exist in this case.

### A. There is no general jurisdiction over Fight Sports or Abreu.

On appeal, Schneider argues that Fight Sports had continuous and systematic contacts that justify the exercise of general personal jurisdiction. She relies on: (1) Fight Sports's "affiliation" with Rockstar, its coaches, and other small gyms; (2) the jiu jitsu seminars that Fight Sports offered in Texas featuring Abreu; (3) Oliveira's actions of competing in Texas for Fight Sports and (allegedly) serving as agent or employee of Fight Sports to further its business in Texas; and (4) Abreu's participation in jiu jitsu competitions in Texas.

#### 1. 'Affiliation' with Rockstar, its coaches, and other gyms

Schneider argues that Rockstar and some of its coaches are affiliated with Fight Sports. Fight Sports denied this. In his affidavit, Abreu averred that although Fight Sports does have affiliated gyms, Rockstar is not one of them. Schneider presented as evidence screen shots that mentioned "Fight Sports" in reference to where some Rockstar employees trained, but that was evidence of what Rockstar did to promote itself, not evidence of a purposeful contact made by Fight Sports.

15

*See Moncrief Oil Int'l*, 414 S.W.3d at 151 (holding that courts may only consider actions taken by nonresident defendant when evaluating sufficiency of minimum contacts for exercise of personal jurisdiction).

To the extent that Schneider was trying to impute Rockstar's contacts with Texas to Fight Sports, she failed to do so. Schneider did not provide any evidence that Fight Sports was anything other than a separate business entity, distinct from Rockstar. "Texas law presumes that two separate corporations are distinct entities." *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 173 (Tex. 2007); *see also Costamare, Inc. v. Mamou*, No. 01-23-00865-CV, 2025 WL 863779, at *6, *9 (Tex. App.—Houston [1st Dist.] Mar. 20, 2025, no pet.) (mem. op.) (rejecting alter ego theory of personal jurisdiction). Here, there is nothing in the pleadings or jurisdictional evidence to refute the presumption that the separate companies—Rockstar and Fight Sports—are distinct entities.

Schneider also relies on the agreements with Fight Sports that allowed Rockstar and other smaller gyms to compete in jiu jitsu competitions. The jurisdictional evidence showed that Rockstar asked Fight Sports to be its sponsor and, like the other smaller gyms that entered into similar agreements, Rockstar paid for the privilege of its students fighting in competitions under Fight Sports's banner while wearing a Fight Sports patch on their uniforms. Abreu's affidavit explained this relationship in context of the sport and competitions, and he averred

16

that it was Rockstar, not Fight Sports, that initiated this relationship. There was no evidence or allegation that Fight Sports actively advertised or reached out to Texas gyms seeking to do this kind of business, and in his affidavit, Abreu denied having ever "actively marketed" in Texas. No evidence demonstrated that the affiliation extended beyond the use of the Fight Sports name, patch, and banner for entry into certain competitions. While Fight Sports certainly earned some money from these agreements, because it was the smaller gyms, not Fight Sports, that sought out these agreements, we cannot say that Fight Sports purposefully reached beyond Florida to form continuing relationships and obligations with Texas citizens. *See Moncrief Oil Int'l*, 414 S.W.3d at 151. Thus, these contacts can be considered fortuitous rather than purposeful. *See, e.g.*, *Old Republic*, 549 S.W.3d at 559. And even if they were purposeful contacts, the evidence shows that Fight Sports earned $41,150 in total from Texas sponsorships for competition in a five-year period, whereas Fight Sports operates internationally with affiliated gyms on four continents. The competition sponsorship agreements do not demonstrate that Abreu or Fight Sports is essentially at home in Texas, as is needed for a court to exercise general personal jurisdiction. *See id.* at 565.

### 2. Jiu jitsu seminars in Texas

Schneider next relies on the jiu jitsu seminars that Fight Sports conducted in Texas, which were taught by Abreu and for which Fight Sports was compensated.

17

Abreu averred that he had traveled to Texas to give seminars on three or four occasions, and in each instance, he "was asked to travel to Texas to give the seminars." Abreu did not specify whether Fight Sports, a Texas business, or a Texas resident asked him to travel to Texas. These are not purposeful contacts between Abreu and Texas because Abreu did not clearly seek some benefit, advantage, or profit by availing himself of the jurisdiction in this way. However, the seminars could be considered purposeful contacts between Fight Sports and Texas because Fight Sports was compensated for the seminars. But even if they are purposeful contacts by Fight Sports, they were occasional, not systematic and continuous, and they do not show that Fight Sports is essentially at home in Texas, as is needed for a court to exercise general personal jurisdiction. *See id.*

### 3. Oliveira's actions as athlete, agent, or employee

The undisputed jurisdictional evidence here showed that Abreu, on behalf of Fight Sports, filed a petition for Oliveira to a beneficiary for the purpose of a P-1 visa. As Schneider explained and conceded in her brief, considering the undisputed facts and the special nature of a P-1 visa, Oliveira "entered the United States as a professional athlete '**to be employed as an athlete**' for at least four years." Appellee's Br. 17 n.5. The letter Abreu sent to USCIS, on behalf of Fight Sports, which stated that Oliveira no longer worked for Fight Sports, establishes that Oliveira had worked for Fight Sports in some capacity, but it does not demonstrate

18

that Oliveira worked for Fight Sports as an agent, instructor, or coach. Schneider asserts that Oliveira competed under the name and wearing the patch of Fight Sports while he was in Texas. This is consistent with him working for Fight Sports *as an athlete*. But this evidence has no tendency to prove any broader relationship between Oliveira and Fight Sports: it does not show that Oliveira was an agent, coach, or instructor for Fight Sports. Abreu's affidavit similarly denies that Oliveira was a Fight Sports agent, coach, or instructor.

In her pleading, Schneider alleged that Abreu "brought . . . Oliveira to Texas where [he] became a Fight Sports affiliated instructor at a Rockstar Martial Arts gym, which was also affiliated with Fight Sports."[4] In her response to the special appearance, Schneider argued that she had alleged that "Defendant Abreu trained and recommended her coach Defendant Oliveira to [Rockstar]."[5] That Fight Sports sent Oliveira to Texas to coach students at Rockstar was refuted by Fight Sports's jurisdictional evidence. In his affidavit, Abreu averred: "Neither I nor any [Fight Sports] entity 'brought Olivera to Texas.' Rather, any decision regarding

---

[4]  We have already addressed Schneider's allegations about affiliation in section IV.A.1., above.

[5]  On appeal, Schneider argues that "Fight Sports had a duty to ensure that the professional athlete it sent to Texas to coach and train students at Rockstar Gym would not injure a student. By sending Oliveira, an unfit coach with aggressive tendencies, to Texas for the purpose of coaching students at Rockstar Gym, Fight Sports breached its duty *in Texas* to keep those students *in Texas* from harm." Nothing in Schneider's pleading or jurisdictional evidence showed that Fight Sports knew that Oliveira was an unfit coach with aggressive tendencies before he went to work for Rockstar.

employment, affiliation, training, hiring, direction, or management of Oliveira was solely made by some or all of the Rockstar Martial Arts entities in Texas." And even if Abreu recommended Oliveira, nothing in the record shows that Abreu sought some benefit, advantage, or profit by doing so. *See Moncrief Oil Int'l*, 414 S.W.3d at 151.

It is undisputed that Fight Sports trained Oliveira, just as it is undisputed that such training occurred in Florida, not Texas. Abreu and Fight Sports's training of Oliveira cannot be considered a minimum contact with Texas.

### 4. Abreu's participation in Texas competitions

Finally, Schneider relies on Abreu's participation in Texas jiu jitsu competitions. Abreu did not dispute that he has traveled to competitions in Texas, and in his response to jurisdictional discovery, Abreu stated that he had participated in three competitions in Texas between June 2019 and July 2020. These can be considered purposeful contacts with Texas, but like the seminars, they were occasional, not systematic and continuous, and they do not show that Abreu (or Fight Sports) is essentially at home in Texas, as is needed for a court to exercise general personal jurisdiction. *See Old Republic*, 549 S.W.3d at 565.

* * *

Having considered the pleadings, special appearance, and jurisdictional evidence, we conclude that neither Abreu, a Florida resident, nor Fight Sports, a

Florida business, had such continuous and systematic contacts with Texas as to render either appellee essentially at home in this state. *See TV Azteca*, 490 S.W.3d at 37. We hold that the court did not have general personal jurisdiction over Abreu or Fight Sports. *See id.*

**B.      There is no specific jurisdiction over Fight Sports or Abreu.**

Having concluded that there is no general jurisdiction over either Fight Sports or Abreu, we now consider whether the court has specific personal jurisdiction over either of them. Our specific jurisdiction requires us to consider whether Schneider's lawsuit arose out of or related to their purposeful contacts with Texas. *See Ford Motor Co.*, 592 U.S. at 362. We need not assess Abreu's and Fight Sports's contacts on a claim-by-claim basis in this case, however, because Schneider's claims arise, if at all, from the same forum contacts. *See Moncrief Oil*, 414 S.W.3d at 150–51.

In her original petition, Schneider alleged claims for vicarious liability, negligent failure to protect, and negligent hiring, retention, supervision and training arose out of or were related to Abreu's and Fight Sports's contacts with Texas.[6] First, Schneider seeks to impose liability on Abreu and Fight Sports for Oliveira's

---

[6]      Vicarious liability is not a cause of action but a legal doctrine and an exception to the general rule that a person has no duty to control the conduct of another. *See Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 130 (Tex. 2018) (quoting *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 540 (Tex. 2002) (plurality op.)).

sexual assault through various theories of vicarious liability. Second, in her negligent failure to protect cause of action, Schneider seeks to impose liability on Abreu and Fight Sports for failing to warn "against the risk of injury by instructors, including Defendant Oliveira." Third, in her negligent hiring, retention, supervision, and training cause of action, Schneider seeks to impose liability on Abreu and Fight Sports for failing to "properly screen, hire, and train their coaches, including Defendant Oliveira," and for providing "Oliveira direct and continued access to minors, despite failing to adequately investigate, regulate, monitor, and supervise Defendant Oliveira."

In our analysis in section I.A., we identified the forum contacts that could be attributed to Fight Sports or Abreu. Specifically, in sections I.A.1 and I.A.2, we explained that the competition sponsorship agreements with Texas and the seminars held in Texas are purposeful contacts that can be imputed to Fight Sports. In section I.A.3, we explained that the evidence demonstrates that Fight Sports employed Oliveira as an athlete within the meaning of the P-1 visa while he was in Texas. In section I.A.4., we concluded that Abreu's only purposeful forum contact is his participation in three jiu jitsu competitions in Texas between 2019 and 2020.

Schneider's claims are unrelated to Abreu's participation in three jiu jitsu competitions in Texas between 2019 and 2020. The court lacks specific personal jurisdiction over him.

22

Schneider's claims are also unrelated to Fight Sports's sponsorship of Rockstar to participate in jiu jitsu tournaments, holding jiu jitsu seminars in Texas, or employing Oliveira as an athlete under a P-1 visa. While a "but for" relationship may exist between some of Fight Sports's contacts i.e., but for the sponsorship, Oliveira might not have driven Schneider to Houston, or but for the P-1 visa, Oliveira might not have been working in the United States—the Texas Supreme Court has held that but-for causation alone cannot form the basis for specific jurisdiction in Texas. *See Moncrief* at 157. Schneider's claims of failure to protect and negligent hiring, retention, supervision, and training are premised on an employment relationship in which Oliveira is either an instructor or coach for Fight Sports. These claims do not arise out of Fight Sports's employment of Oliveira as an athlete under a P-1 visa because the claims center on Oliveira's intentional tort of sexual assault, not his performance as an athlete. We conclude that the court lacks specific personal jurisdiction over Fight Sports because there is no nexus between Fight Sports, Schneider's claims, and the State of Texas. *See Luciano*, 625 S.W.3d at 14.

## Conclusion

We conclude that no personal jurisdiction exists as to Abreu or Fight Sports, and we hold that the trial court erred by denying their special appearance. We reverse the order of the trial court, and render judgment dismissing Schneider's claims against Abreu and Fight Sports.

Susanna Dokupil
Justice

Panel consists of Justices Guerra, Gunn, and Dokupil.