In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-24-00103-CV
_____

VIKOR SCIENTIFIC, LLC, Appellant

V.

KACHINA AIR, INC., GAI AIR, LLC F/K/A GSAIC, LLC, AWMR, LLC, AAW INVESTMENTS, LLC AND XIAN HUA "AARON" WANG, Appellees

On Appeal from the 284th District Court
Montgomery County, Texas
Trial Cause No. 22-06-07372-CV

## MEMORANDUM OPINION

This is an interlocutory appeal from the denial of Appellant Vikor Scientific, LLC's special appearance challenging the trial court's jurisdiction. Vikor is a South Carolina limited liability company that performs laboratory diagnostic services for health care providers and clinicians throughout the country, with its principal place of business in Charleston, South Carolina. After Creek Crossing Management, LLC ("Creek Crossing"), individually and derivatively on behalf of Radius Flex

Logistics, LLC, ("Radius Flex") filed a lawsuit against Appellants Kachina Air, Inc., GAI Air, LLC f/k/a GSAIC, LLC, AWMR, LLC, AAW Investments, LLC, and Xian Hua "Aaron" Wang (collectively, the "Kachina Parties"), the Kachina Parties filed a third-party action bringing Vikor into the case based on allegations of civil conspiracy, money had and received, quantum meruit, and unjust enrichment. Challenging jurisdiction, Vikor filed a special appearance which the trial court denied. Because we conclude that the trial court lacks personal jurisdiction over Vikor, both generally and specifically as to all of the Kachina Parties' claims, we reverse the trial court's order denying Vikor's special appearance.

Background

On January 9, 2019, Creek Crossing and Vikor entered into a management services agreement whereby Creek Crossing, as a transportation, freight, and logistics broker, offered freight management and logistics management and reporting to Vikor. Vikor agreed to pay Creek Crossing for all shipments facilitated by Creek Crossing through the agreement. According to the pleadings, Creek Crossing's sole member, Gregory Lewis, subsequently decided that his company could better serve the industry by providing delivery services itself instead of brokering and outsourcing delivery to third parties, so he began investigating in late 2020 a Part 135 Certificate which would authorize operation as an on-demand air charter carrier for hire for compensation or profit. A Part 135 Certificate is issued to

a "certificate holder," who must meet certain requirements. Lewis was introduced to Wang by an acquaintance and understood that Wang had expertise in aircraft operations and several other companies with access to airplanes, airplane hangars and related facilities, and pilots and related technicians necessary for flying. Creek Crossing's petition alleges that in or around May 2021, the acquaintance and Wang had identified a Part 135 Certificate, and that Wang set up a new company, GAI Air, for an option to acquire Kachina Air, contingent upon the FAA's issuing Kachina Air its then-pending Part 135 Certificate.

On June 2, 2021, Creek Crossing and Kachina Air executed a Joint Venture Agreement (the "JVA") creating a newly formed company, Radius Flex Logistics, LLC. According to the terms of the JVA, prior to a liquidity event, Radius Flex was to acquire the Part 135 Certificate purchased and managed by Kachina Air, and Creek Crossing was to assign contracts and revenue to Radius Flex "when planes\routes are operational as agreed." According to Creek Crossing's petition, Radius Flex tested the operational viability of delivery routes with the planes under or contemplated to be under the Part 135 Certificate. Creek Crossing obtained permission from its customers, including Vikor, for Radius Flex to make deliveries on its behalf. Neither Radius Flex nor Creek Crossing charged the customers anything for these validation exercises. Creek Crossing alleges that after facilitating the acquisition of Kachina Air and the Part 135 Certificate in October 2021, Wang,

3

individually and through his companies, began to implement a scheme to avoid financial obligations to Radius Flex and coerce a buyout by Creek Crossing on unfair terms.

Creek Crossing sued the Kachina Parties, and the Kachina Parties counterclaimed. The trial court ordered an accounting firm to perform an independent accounting of Radius Flex. The accounting report states that "Based on total [Creek Crossing] Sales, Vikor accounts for $7,078,77.12, [sic] 70.4% of [Creek Crossing's] recorded Revenues/Sales." The report also states that

> Vikor has not been invoiced to date (December 20, 2022) for any packages received by Radius Flex and has not made any payments to Radius Flex for any packages received. Greg Lewis has stated numerous times that the packages that Radius Flex transported were at "No Charge" while developing Radius Flex logistics services until [Vikor is] notified otherwise.

The Kachina Parties amended their pleadings to add Vikor as a third-party defendant against whom the Kachina Parties assert claims for civil conspiracy, money had and received, quantum meruit, and unjust enrichment.[1] Regarding jurisdiction, the Kachina Parties' pleading asserts,

> All counter-defendants and third-party defendants have either appeared in this lawsuit, reside in Texas, do business in Texas, and/ or have sufficient minimum contacts (both specific and general) with the State of Texas such that the exercise of jurisdiction over them would not offend the traditional notions of fair play and substantial justice.

---

[1] We note that civil conspiracy is not an independent tort but a theory of vicarious liability. *See Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019).

In response, Vikor filed a special appearance, asking the court to dismiss Vikor for lack of personal jurisdiction. The special appearance asserts that the Kachina Parties' jurisdictional allegations are conclusory and that the Declaration of Dan Nodes attached to Vikor's special appearance negates any factual basis for personal jurisdiction over Vikor. Vikor's special appearance argues that Vikor is "at home" in South Carolina, that it does not engage in "continuous and systematic" contacts in Texas, and that its mere relationship with Creek Crossing "is insufficient to confer specific jurisdiction over Vikor in Texas[,]" because "the operative facts of this lawsuit involve a failed business venture undertaken jointly by the other parties to this litigation not Vikor[.]"Vikor supported its special appearance with the declaration of Dan Nodes, who states,

> I am the Chief Operating Officer of Third-Party Defendant Vikor Scientific, LLC ("Vikor"). Vikor is not a Texas entity. It is South Carolina limited liability company with its principal place of business in Charleston, South Carolina.
>
> […]
>
> While Vikor performs testing services for health care providers and clinicians located throughout the country, Vikor's headquarters and principal place of business is in Charleston, South Carolina. Vikor does not maintain any offices in the State of Texas.
>
> Vikor entered an agreement with Plaintiff Cross Creek Management, LLC ("CCM"), for freight management services on January 7, 2019, and has complied with the terms of its agreement with CCM, at all times since. Vikor has never had a contract or other form of agreement with any of the Third-Party Plaintiffs for freight management services and has no knowledge of the terms of any contract or agreement that exists

or may have existed between the other parties to this lawsuit, including Third-Party Plaintiffs and Plaintiff CCM.

The Kachina Parties filed a Supplement to the First Amended Counterclaim and Third-Party Claim in which they alleged the following supplemental jurisdictional facts:

- Vikor is a South Carolina molecular diagnostics company that performs laboratory diagnostic services for health care providers throughout the United States and Texas.

- Vikor has purposefully targeted the Texas market, has done business in Texas and has substantial continuous and systematic activity in Texas.

- Vikor has committed a tort in whole or in part in Texas.

- Vikor provides its services to almost 1,000 medical provider accounts in Texas.

- Vikor markets and solicits business from its Texas accounts. Vikor has received thousands of lab samples from Texas.

- Vikor has been in a contractual relationship with defendant Creek Crossing LLC (a Texas company) for freight management services since January 2019, that included the delivery of packages by Radius Flex from Texas.

- Vikor has recruited, hired, staffed and maintained 28 employees in Texas who solicit sales and market Vikor services in Texas.

- Vikor maintains a website available to Texas residents.

- Vikor's website contains a customer portal where its Texas customers can and have requested packages to be picked up in Texas and delivered to Vikor.

The Kachina Parties also filed a response to Vikor's Special Appearance in which they include the following jurisdictional evidence: (1) Vikor's responses to Kachina's Requests for Admission; (2) Vikor's Responses to Kachina's Interrogatories; (3) Declaration of Loma Sedehi and its Exhibits; (4) The May 28, 2023 report of PBL Services, LLC; (5) Radius Flex JVA Agreement; (6) Vikor – Creek Crossing Contract; (7) Order overruling Vikor Special Appearance in *Freightpop, Inc. v. Creek Crossing Management LLC, Gregory J. Lewis, Radius Flex, LLC and Vikor Scientific, LLC*, Cause No. 23-09-1415, in the 457th District Court, Montgomery County, Texas; and (8) Excerpts from Vikor's website.

In their response, the Kachina Parties argue general jurisdiction exists because of the supplemental jurisdictional facts asserted in their Supplement to the First Amended Counterclaim and Third-Party Claim. The Kachina Parties also argue the trial court has specific jurisdiction over Vikor because Vikor purposefully availed itself of conducting business in Texas by targeting and selling its services to Texas customers and employing a large sales team in Texas to market Vikor's services to Texas customers. Moreover, the Kachina Parties argue that a "substantial connection" exists between Vikor's Texas business and the operative facts of the case because the jurisdictional facts show that: (1) Vikor has had a contractual relationship with Creek Crossing since 2019; (2) Vikor did $7 million worth of business with Creek Crossing in 2022, which was 70% of Creek Crossing's total

7

revenue that year; (3) Creek Crossing promised to hand over its contract with Vikor to Radius Flex; (4) the basis of the formation of Radius Flex was Creek Crossing's contract with Vikor; (5) Vikor had dozens of employees in Texas and marketed in Texas; (6) the packages delivered to Vikor by Radius Flex on AMWR airplanes at Lewis's and Creek Crossing's direction form the basis of the claims against Vikor; and (7) the only packages in Radius Flex's history were delivered to Vikor.

The evidence attached to the Kachina Parties' response includes Vikor's Answers to the Kachina Parties' Requests for Admission. In those, Vikor admits that twenty-eight of its employees resided in Texas, worked for Vikor, and conducted marketing activities for Vikor in Texas from approximately 2020 to 2023. Vikor also admits that its customers can and have reordered supplies and can and have requested packages be picked up from them in Texas and delivered to Vikor through Vikor's website.

In Vikor's Answers to the Kachina Parties' First Set of Interrogatories, Vikor provides the following information:

- During the period noted by the Kachina Parties, Vikor serviced 998 accounts in Texas, which represented 11.5% of all accounts.

- Vikor's sales representatives would meet with physician practices to describe the benefits of Vikor's laboratory testing services.

- Vikor identified thirty employees likely engaged in marketing activities on behalf of Vikor.

- On December 31, 2022, Vikor had 293 employees, 14 of whom identified Texas as their resident state (less than 5% of employee count).

Vikor filed a reply responding to the Kachina Parties' supplemental jurisdictional allegations, arguments and evidence. The trial court overruled Vikor's Special Appearance. Vikor filed its Notice of Appeal ten days later.

Personal Jurisdiction

For any court to render a binding judgment, it must have jurisdiction over both the subject matter and the parties. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 7-8 (Tex. 2021). Subject matter jurisdiction is not disputed in this case, but Vikor asserts the trial court lacks personal jurisdiction over it. Nonresidents, such as Vikor, are subject to personal jurisdiction in Texas courts only if such jurisdiction is authorized by statute and only when the exercise of jurisdiction over the nonresident is consistent with the due-process guarantees of the United States Constitution. *Id.* at 8.

Known as the "long-arm statute," Chapter 17 of the Texas Civil Practice and Remedies Code provides a framework for Texas courts to serve process on, and exercise personal jurisdiction over, nonresidents who do business in Texas. Section 17.042 provides,

> In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:

(1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;

(2) commits a tort in whole or in part in this state; or

(3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

Tex. Civ. Prac. & Rem. Code Ann. § 17.042. But even when a nonresident engages in such activities, a Texas court may not exercise jurisdiction over the nonresident if doing so would violate constitutional due process. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 788 (Tex. 2005). Because the statute broadly includes "other acts that may constitute doing business," the Texas Supreme Court has held, "The broad language of the long-arm statute's 'doing business' requirement permits the statute to reach as far as the federal constitutional requirements of due process will allow." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991) (internal citation omitted); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 17.042. Consequently, to determine whether a Texas court may exercise personal jurisdiction over a nonresident in a particular case, the court need only determine whether doing so would be "consistent with federal constitutional requirements of due process[.]" *Id.* Constitutional due process is satisfied when the nonresident "ha[s] certain minimum contacts with [Texas] such that the maintenance of the suit [in Texas] does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v.*

10

*Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *see also Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657 (Tex. 2010).

General Jurisdiction

A defendant's contacts may support either general personal jurisdiction or specific personal jurisdiction. *See Moncrief Oil Int'l, Inc. v. OAO Gazprom Export, LLC*, 414 S.W.3d 142, 150 (Tex. 2013). General jurisdiction arises when a defendant's contacts with the forum state are so "continuous and systematic" that the defendant is "essentially at home[ ]" in the forum state. *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 412 (Tex. 2023) (citations omitted). This kind of personal jurisdiction allows courts to render a binding judgment against a defendant even if the plaintiff's claims neither arise from activities conducted in the forum state nor "'relate to the forum [s]tate or the defendant's activity there.'" *Id.* (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021)).

General jurisdiction requires a more demanding minimum-contacts analysis than specific jurisdiction does, and the nonresident defendant must have conducted substantial activities within the forum. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 797 (Tex. 2002). "General jurisdiction is premised on the notion of consent. That is, by invoking the benefits and protections of a forum's laws, a nonresident defendant consents to being sued there." *Am. Type Culture Collection,*

11

*Inc. v. Coleman*, 83 S.W.3d 801, 808 (Tex. 2002). The plaintiff must establish more than isolated or sporadic visits with the forum before such contacts will constitute the type of continuous, systematic, and substantial contacts necessary for general jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-19 (1984). Recognizing that Vikor is a limited liability company rather than a corporation, we nevertheless find it instructive that

> [t]he "paradigm" forums in which a corporate defendant is "at home," are the corporation's place of incorporation and its principal place of business. The exercise of general jurisdiction is not limited to these forums; in an "exceptional case," a corporate defendant's operations in another forum "may be so substantial and of such a nature as to render the corporation at home in that State."

*BNSF Ry. v. Tyrrell*, 581 U.S. 402, 413 (2017) (cleaned up) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137, 139 n.19 (2014)).

Specific Jurisdiction

A Texas court can exercise specific jurisdiction over a nonresident defendant when two conditions are met: (1) the defendant engages in some act by which it purposefully avails itself of the privilege of conducting activities in Texas, and (2) the plaintiff's claims arise out of or relate to those Texas contacts. *Volkswagen Aktiengesellschaf,* 669 S.W.3d at 412 (citing *Ford Motor Co.*, 592 U.S. at 352; *Luciano*, 625 S.W.3d at 8-9; *see also Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 576, 579 (Tex. 2007) (specific-jurisdiction analysis involves two co-equal components: purposeful availment and relatedness)).

12

*Purposeful Availment*

"At its core, the purposeful availment analysis seeks to determine whether a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there." *Moncrief Oil*, 414 S.W.3d at 152. "This analysis focuses on the quality and nature of the contacts, not just the quantity." *Id*. at 154. Focusing on the "quality and nature" of the nonresident's contacts with Texas, we are guided by three principles when analyzing purposeful availment:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person.
>
> Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated.
>
> […]
>
> Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

*Moki Mac*, 221 S.W.3d at 575 (internal quotation marks and citations omitted); *see also Am. Type*, 83 S.W.3d at 806 ("It is the quality and nature of the defendant's contacts, rather than their number, that is important to the minimum-contacts analysis.").

*Relatedness*

"The 'arise from or relate to' requirement lies at the heart of specific jurisdiction by defining the required nexus between the nonresident defendant, the litigation, and the forum." *Moki Mac*, 221 S.W.3d at 579. "[F]or a nonresident

defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation." *Id.* at 585. "'Even a single purposeful contact may be sufficient to meet the requirements of minimum contacts when the cause of action arises from the contact.'" *Michiana*, 168 S.W.3d at 795 (quoting *Micromedia v. Automated Broad. Controls*, 799 F.2d 230, 234 (5th Cir. 1986)).

Special Appearance

The Kachina Parties, as third-party plaintiffs, bore "the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute." *Kelly*, 301 S.W.3d at 658. To challenge the court's personal jurisdiction, the nonresident defendant – or in this case, Vikor, as the nonresident third-party defendant – must file a special appearance before any other pleading or motion. *See* Tex. R. Civ. P. 120a. A special appearance must be supported by affidavit. *Id.* When a plaintiff's petition includes no jurisdictional facts, the defendant may defeat jurisdiction merely by proving he does not reside in Texas. *Kelly*, 301 S.W.3d at 658-59. The plaintiff, however, may amend the petition to include jurisdictional facts "thereby allowing jurisdiction to be decided based on evidence rather than allegations, as it should be." *Id.* at 659. "Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant filing a special

appearance bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff." *Id.* at 658.

A defendant may attack the plaintiff's jurisdictional allegations factually, legally or both. *Id.* at 659. Factually, the defendant can present evidence negating the alleged contacts with Texas, thereby shifting the burden back to the plaintiff to respond with evidence to support its jurisdictional allegations. *Id.* at 658-59. "Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction[.]" *Id.* at 659.

Rule 120a(3) requires a trial court to "determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." Tex. R. Civ. P. 120a(3). If the trial court grants the special appearance, the nonresident defendant is dismissed from the case, and an ordinary appeal may be filed by the plaintiff. If, as in this case, the trial court denies the special appearance, the nonresident defendant may file an interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7). On appeal we conduct a de novo review of the trial court's ruling, because personal jurisdiction is a question of law. *Am. Type*, 83 S.W.3d at 805-06. The scope of our review includes all evidence in the record. *See Phillips Dev. & Realty, LLC v. LJA Eng'g, Inc.*, 499 S.W.3d 78, 85 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *Wise v. Nims*, No. 09-95-

00214 CV, 1996 Tex. App. LEXIS 4835, at *5 (Tex. App.—Beaumont Oct. 31, 1996, no writ) (not designated for publication). "When the trial court does not issue findings of fact, reviewing courts should presume that the trial court resolved all factual disputes in favor of its judgment." *Am. Type*, 83 S.W.3d at 806. "When the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court." *BMC Software*, 83 S.W.3d at 795 (citations omitted).

Analysis

Vikor argues on appeal that the trial court erred in denying its special appearance, challenging—as it must—both general and specific jurisdiction.

*General Jurisdiction*

Vikor argues that it is not "essentially at home" in Texas and that there are no forum contacts shown in the record that would authorize the district court to exercise general jurisdiction over the non-resident, Vikor. Moreover, Vikor emphasizes it is organized under the laws of, has its principal place of business in, and is only "at home" in South Carolina. The Kachina Parties argue there is general jurisdiction over Vikor because Vikor has substantial, continuous corporate operations in Texas. They point to the jurisdictional facts asserted in their Supplement to the First Amended Counterclaim and Third-Party Claim which include Vikor's marketing, business, and website activities in Texas. At oral argument, the Kachina Parties

16

acknowledged that a showing of general jurisdiction requires exceptional circumstances but reasoned that there are such circumstances in this case because eleven percent of Vikor's accounts are located in Texas, and seventy percent of Creek Crossing's revenue in 2022 came from Vikor.

We do not agree with the Kachina Parties that Vikor's contacts with the State of Texas – whether that be through its relationship with Creek Crossing or through its other business activities – are so continuous, systematic and substantial that they establish that Vikor is "essentially at home" and subject to general jurisdiction in Texas. *See, e.g., Daimler AG*, 571 U.S. at 127; *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 565 (Tex. 2018). The parties do not dispute that Vikor is organized under the laws of South Carolina and has its principal place of business there. These facts are generally regarded as the hallmark of general jurisdiction. *See Daimler AG*, 571 U.S. at 138-139 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 919 (2011)); *see also Ford Motor Co.*, 592 U.S. at 359; *Ford Motor Co. v. Cejas*, No. 09-16-00280-CV, 2018 Tex. App. LEXIS 1389, at *26-27 (Tex. App.—Beaumont Feb. 22, 2018, no pet.) (mem. op.). Because Vikor is neither incorporated nor has its principal place of business in Texas, Vikor is not "at home" in Texas unless its other contacts with Texas are so systematic, continuous and substantial that this case is "exceptional."

We are not persuaded that because eleven percent of Vikor's business accounts are located in Texas exceptional circumstances exist to justify general jurisdiction. This necessarily means eighty-nine percent of Vikor's business accounts are located outside the state of Texas. "A corporation that operates in many places can scarcely be deemed at home in all of them." *Daimler AG*, 571 U.S. at 138, 140 n.20 (characterizing exercise of general jurisdiction in every state in which corporation "engages in a substantial, continuous, systematic course of business" as "unacceptably grasping").

Similar reasoning applies to the Kachina Parties' argument that seventy percent of Creek Crossing's revenue comes from Vikor. The seventy-percent figure is derived by dividing the amount of Creek Crossing's revenue from Vikor by the amount of Creek Crossing's total revenue. Therefore, Vikor could do the same amount of business with Creek Crossing from year-to-year, and according to the Kachina Parties' argument, Vikor would be more or less "at home" in Texas depending on the amount of business Creek Crossing did with other entities. General jurisdiction must rest on the *defendant's* contacts, not some third party's contacts, with the forum. *See Moncrief Oil*, 414 S.W.3d at 150.

Therefore, based on the record before us, we cannot say that Vikor's "'affiliations with the State are so 'continuous and systematic' as to render [Vikor] essentially at home in the forum State.'" *See Daimler AG*, 571 U.S. at 139 (quoting

*Goodyear*, 564 U.S. at 919). We conclude that there is no general jurisdiction over Vikor. *See id.*

*Specific Jurisdiction*

Vikor argues there is no substantial connection between Vikor's contacts in Texas and the operative facts of the litigation. "The operative facts are those on which the trial will focus to prove the liability of the defendant who is challenging jurisdiction." *Kaye/Bassman Int'l Corp. v. Dhanuka*, 418 S.W.3d 352, 357 (Tex. App.—Dallas 2013, no pet.); *see also Moki Mac*, 221 S.W.3d at 588 ("[T]he injuries for which the Druggs seek recovery are based on Andy's death on the hiking trail in Arizona, and the relationship between the operative facts of the litigation and Moki Mac's promotional activities in Texas are simply too attenuated to satisfy specific jurisdiction's due-process concerns."). Vikor argues the Kachina Parties' claims for conspiracy, money had and received, quantum meruit, and unjust enrichment did not arise from, and are unrelated to, Vikor's activities in Texas, but arise out of the JVA to which it was not a party. Vikor also claims that the Kachina Parties are impermissibly relying on the unilateral activity of other parties, such as Creek Crossing, in an attempt to establish purposeful availment.

The Kachina Parties argue Vikor has purposefully availed itself of conducting business in Texas by: performing laboratory diagnostic services for almost 1,000 medical providers in Texas; marketing and soliciting business from its Texas

19

accounts; hiring and maintaining twenty-eight employees in Texas who solicit sales and market Vikor's services in Texas; receiving thousands of lab samples from Texas; maintaining a website available to Texas residents, with a customer portal that has been used by Texas customers to request that lab samples be picked up in Texas and delivered to Vikor; and having a contractual relationship with Creek Crossing (a Texas company) for freight management services since January 2019 that includes delivery of packages by Radius Flex from Texas. They argue a substantial connection exists between Vikor's activities in Texas and the operative facts of the lawsuit, pointing primarily to Vikor's twenty-eight employees in Texas and its contractual relationship with Creek Crossing. Therefore, we will first address these two contacts in the context of the purposeful availment and relatedness inquiries.

*Vikor's Contract with Creek Crossing*

Creek Crossing and Vikor entered into a Management Services Agreement ("MSA") on January 9, 2019. The terms of the agreement state that Vikor will supply Creek Crossing a list of daily pickup addresses and pickup days for its packages, that Creek Crossing will invoice Vikor on a weekly basis, and that Vikor will pay Creek Crossing by credit card. About a year and a half into the MSA, Creek Crossing and Kachina Air entered into the JVA to form Radius Flex in June 2021. Paragraphs nine and ten of the JVA indicate the MSA was assigned to, and became the asset of,

20

Radius Flex. The Kachina Parties argue that Vikor knew about Creek Crossing's entering into the JVA with Kachina and that because the MSA was pulled into the JVA, the controversy in this case is related to Vikor's purposeful activities of obtaining logistics services from Creek Crossing, a Texas entity, via the MSA.

We are not persuaded by the Kachina Parties' arguments, because even if we were to conclude that Vikor purposely availed itself of the benefits of doing business in Texas by entering into the MSA with Creek Crossing, the Kachina Parties' claims arise out of or relate to the JVA between the Kachina Parties and Creek Crossing, not the MSA between Creek Crossing and Vikor. *See Moki Mac*, 221 S.W.3d at 579, 582, 585.

First, Creek Crossing's assignment of the MSA to Radius Flex was the unilateral activity of third parties, namely Creek Crossing and Kachina, which is insufficient to qualify as purposeful availment. *See Guardian Royal Exch. Assurance, Ltd.*, 815 S.W.2d at 227-28 (noting that to qualify as a minimum contact, "the contact must have resulted from the nonresident defendant's purposeful conduct and not the unilateral activity of the plaintiff or others"); *see also Michiana*, 168 S.W.3d at 785. Given the facts presented, Vikor's contacts with Texas relative to the JVA were fortuitous since it was the activity of Creek Crossing and Kachina, not Vikor, which led to the JVA. The assignment of the MSA to Radius Flex, Vikor's purported knowledge about the joint venture, and Vikor's acceptance of free

21

shipping all amount to passive acquiescence, not purposeful availment.[2] Creek Crossing's unilateral choice to partner with the Kachina Parties does not warrant the conclusion that Vikor made purposeful contact with Texas. *See Michiana*, 168 S.W.3d at 788 (holding that responding to a telephone call from the forum state and sending payment to the forum state do not establish minimum contacts for jurisdictional purposes).

Second, even if the MSA constituted purposeful availment, the Kachina Parties' claims of civil conspiracy, money had and received, quantum meruit, and unjust enrichment do not arise out of or relate to the MSA; instead, they arise out of the JVA. *See Moki Mac*, 221 S.W.3d at 579, 582, 585. The Kachina Parties' pleadings allege:

> This lawsuit is about the illegal and/or uncompensated use of aircraft belonging to AWMR and/or leased to Kachina to support the Radius Flex business (jointly owned by Kachina and [Creek Crossing], 45%/55%). This lawsuit is filed to compensate Counter-Plaintiffs for the use of the planes in the past, well over 600 flights, damages caused to the planes, unjust enrichment received by [Creek Crossing] and Vikor for delivery of packages without compensation, and recovery of damages for the numerous false statements on which [the Kachina Parties] relied when deciding to support and contribute to the Radius Flex project, and for other damages incurred. Additionally, [the Kachina Parties] seek to declare the purported agreement involved is

---

[2]Our review of the record does not show that Vikor had knowledge that Creek Crossing and Kachina Air entered into a JVA but rather Vikor knew from Creek Crossing that the packages Radius Flex transported were at "no charge" while Radius Flex logistics services were being developed. Regardless of whether Vikor knew of the joint venture or not, passive knowledge that Creek Crossing and Kachina Air entered into a JVA is not activity by Vikor.

illegal and, thus, void and unenforceable, and to obtain other declarations from this Court necessary to terminate [Radius Flex] and/or terminate Kachina's interest in and/or obligations to or for [Radius Flex].

[. . .]

At the center of this case is a purported agreement between Kachina and [Creek Crossing] to form and operate [Radius Flex]. This was supposedly done via the JVA.

The MSA between Vikor and Creek Crossing is not at the heart of this controversy. Neither party to the MSA has sued the other, and no party alleges any term of the MSA was breached. Instead, the Kachina Parties allege that they were induced by representations made by Creek Crossings to enter into an allegedly void JVA, to which Vikor was not a party, and that Vikor received free shipping of packages transported on Kachina's and AMWR's planes pursuant to the allegedly void JVA. Based on these factual allegations, the Kachina Parties allege that Vikor "conspired" with Creek Crossing, that Vikor "holds money belonging to [the Kachina Parties] in equity and good conscience[,]" that Vikor accepted services from Kachina and AWMR with reasonable notice that they expected to be compensated, and that Vikor "obtained [a] benefit by fraud, or duress or because the contemplated JVA is unenforceable, impossible, thwarted by mutual mistake and/or void because it is illegal." None of these claims arises out of the MSA between Vikor and Creek Crossing.

We conclude Vikor's contract with Creek Crossing, which was assigned to Radius Flex under the JVA, does not justify specific jurisdiction over Vikor, because the operative facts of the Kachina Parties' claims are unrelated to that contract. Therefore, the MSA does not satisfy the relatedness test. *See id.* at 579, 585.

*Vikor's Twenty-eight Texas Employees*

In response to the Kachina Parties' request for admissions, Vikor admitted twenty-eight of its employees resided in Texas during the relevant time period. These employees conduct marketing activities for Vikor in Texas. Vikor described in its response to the Kachina Parties' interrogatories that Vikor's sales representatives meet with medical practices in Texas to describe the benefits of Vikor's laboratory testing services. On December 31, 2022, Vikor had 293 employees, and fourteen (less than five percent) identified Texas as their place of residence.

We conclude the evidence is sufficient to establish Vikor purposefully availed itself of the benefits of doing business in Texas by maintaining employees who conduct marketing activities in Texas. Vikor initiated the contact by seeking out medical practices in Texas to describe the benefits of its laboratory testing services. These contacts are purposeful and not random, fortuitous, or attenuated. *See id.* at 575. That said, our analysis does not end with purposeful availment because "the exercise of specific jurisdiction is prohibited if 'the suit' does not 'aris[e] out of or

24

relat[e] to the defendant's contacts with the forum.'" *Luciano*, 625 S.W.3d at 14 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017)).

According to the Kachina Parties' pleadings, the heart of the controversy is the uncompensated use of Kachina's airplanes to make deliveries to Vikor pursuant to the JVA between Creek Crossing and Kachina Air. The lawsuit is not about the marketing efforts of Vikor's sales force in physicians' offices in Texas, and the Kachina Parties' claims of conspiracy, money had and received, quantum meruit and unjust enrichment will not be advanced by introducing evidence of the marketing activities of Vikor's twenty-eight Texas employees.

In oral argument, the Kachina Parties argued there would have been no need to use Kachina's and AWMR's planes to fly lab samples to Vikor but for Vikor's employees' convincing physicians' offices to use Vikor's laboratory services in the first place. However, the Texas Supreme Court has rejected but-for relatedness as a basis for specific jurisdiction. *Moki Mac*, 221 S.W.3d at 581 ("We agree with those courts and commentators who view the but-for test as too broad and judicially unmoored to satisfy due-process concerns."). The Court explained, "Moki Mac's promotional representations, while theoretically related to Andy's injury on the hiking trail in the sense that but for them he might not have been there, are not sufficiently related to the operative facts underlying Andy's injury for which the

Druggs seek recovery in wrongful death to sustain the exercise of specific jurisdiction." *Id*. at 588. We conclude that the relationship, if any, between Vikor's employees in Texas and the operative facts of the litigation is simply too indirect, tangential and attenuated to satisfy specific jurisdiction's due-process concerns. *Id.*

For the same reasons, we conclude Vikor's other activities (receiving lab samples from medical providers in Texas, performing laboratory diagnostic services for those providers, and maintaining a website with a customer portal whereby Texas customers request that lab samples be picked up in Texas and delivered to Vikor), which were mentioned in the Kachina Parties' pleadings but not emphasized in its briefing or oral argument, are also insufficient to establish specific jurisdiction because the operative facts of the Kachina Parties' claims against Vikor are not sufficiently related to those activities.

## Conclusion

Having found no basis for either general or specific personal jurisdiction over Vikor, we sustain Vikor's issues on appeal. We reverse the trial court's order denying Vikor's special appearance and render the judgment the trial court should have rendered, dismissing the Kachina Parties' claims against Vikor for lack of personal jurisdiction. *See* Tex. R. App. P. 43.2(c).

REVERSED AND RENDERED.

KENT CHAMBERS
Justice

Submitted on September 25, 2025
Opinion Delivered December 4, 2025

Before Golemon, C.J., Wright and Chambers, JJ.